GRAYNED *v.* CITY OF ROCKFORD

No. 70–5106.   Argued January 19, 1972—Decided June 26, 1972

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a statement joining in the judgment and in Part I of the Court's opinion and concurring in the result as to Part II of the opinion, *post,* p. 121. DOUGLAS, J., filed an opinion dissenting in part and joining in Part I of the Court's opinion, *post,* p. 121.

*Sophia H. Hall* argued the cause for appellant.   With her on the briefs were *William R. Ming, Jr.,* and *Aldus S. Mitchell.*

*William E. Collins* argued the cause for appellee. With him on the brief were *A. Curtis Washburn* and *Charles F. Thomas.*

Mr. Justice Marshall delivered the opinion of the Court.

Appellant Richard Grayned was convicted for his part in a demonstration in front of West Senior High School in Rockford, Illinois. Negro students at the school had first presented their grievances to school administrators. When the principal took no action on crucial complaints, a more public demonstration of protest was planned. On April 25, 1969, approximately 200 people—students, their family members, and friends—gathered next to the school grounds. Appellant, whose brother and twin sisters were attending the school, was part of this group. The demonstrators marched around on a sidewalk about 100 feet from the school building, which was set back from the street. Many carried signs which summarized the grievances: "Black cheerleaders to cheer too"; "Black history with black teachers"; "Equal rights, Negro counselors." Others, without placards, made the "power to the people" sign with their upraised and clenched fists.

In other respects, the evidence at appellant's trial was sharply contradictory. Government witnesses reported that the demonstrators repeatedly cheered, chanted, baited policemen, and made other noise that was audible in the school; that hundreds of students were distracted from their school activities and lined the classroom windows to watch the demonstration; that some demonstrators successfully yelled to their friends to leave the school building and join the demonstration; that uncontrolled latenesses after period changes in the school were far greater than usual, with late students admitting that they had been watching the demonstration; and that, in general, orderly school procedure was disrupted. Defense witnesses claimed that the demonstrators were at all times quiet and orderly; that they did not seek to violate the law, but only to "make

a point"; that the only noise was made by policemen using loudspeakers; that almost no students were noticeable at the schoolhouse windows; and that orderly school procedure was not disrupted.

After warning the demonstrators, the police arrested 40 of them, including appellant.[1] For participating in the demonstration, Grayned was tried and convicted of violating two Rockford ordinances, hereinafter referred to as the "antipicketing" ordinance and the "antinoise" ordinance. A $25 fine was imposed for each violation. Since Grayned challenged the constitutionality of each ordinance, he appealed directly to the Supreme Court of Illinois. Ill. Sup. Ct. Rule 302. He claimed that the ordinances were invalid on their face, but did not urge that, as applied to him, the ordinances had punished constitutionally protected activity. The Supreme Court of Illinois held that both ordinances were constitutional on their face. 46 Ill. 2d 492, 263 N. E. 2d 866 (1970). We noted probable jurisdiction, 404 U. S. 820 (1971). We conclude that the antipicketing ordinance is unconstitutional, but affirm the court below with respect to the antinoise ordinance.

---

[1] Police officers testified that "there was no way of picking out any one in particular" while making arrests. Report of Proceedings in Circuit Court, 17th Judicial Circuit, Winnebago County 66. However, apparently only males were arrested. *Id.,* at 65, 135, 147. Since appellant's sole claim in this appeal is that he was convicted under facially unconstitutional ordinances, there is no occasion for us to evaluate either the propriety of these selective arrests or the sufficiency of evidence that appellant himself actually engaged in conduct within the terms of the ordinances. MR. JUSTICE DOUGLAS, in concluding that appellant's particular behavior was protected by the First Amendment, reaches a question not presented by the parties here or in the court below. See Tr. of Oral Arg. 16–17; Jurisdictional Statement 3; *City of Rockford* v. *Grayned,* 46 Ill. 2d 492, 494, 263 N. E. 2d 866, 867 (1970).

## I

At the time of appellant's arrest and conviction, Rockford's antipicketing ordinance provided that

"A person commits disorderly conduct when he knowingly:

. . . . .

"(i) Pickets or demonstrates on a public way within 150 feet of any primary or secondary school building while the school is in session and one-half hour before the school is in session and one-half hour after the school session has been concluded, provided that this subsection does not prohibit the peaceful picketing of any school involved in a labor dispute . . . ." Code of Ordinances, c. 28, § 18.1 (i).

This ordinance is identical to the Chicago disorderly conduct ordinance we have today considered in *Police Department of Chicago* v. *Mosley, ante,* p. 92. For the reasons given in *Mosley,* we agree with dissenting Justice Schaefer below, and hold that § 18.1 (i) violates the Equal Protection Clause of the Fourteenth Amendment. Appellant's conviction under this invalid ordinance must be reversed.[2]

## II

The antinoise ordinance reads, in pertinent part, as follows:

"[N]o person, while on public or private grounds adjacent to any building in which a school or any

---

[2] In November 1971, the antipicketing ordinance was amended to delete the labor picketing proviso. As Rockford notes, "This amendment and deletion has, of course, no effect on Appellant's personal situation." Brief 2. Necessarily, we must consider the facial constitutionality of the ordinance in effect when appellant was arrested and convicted.

class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof. . . ." Code of Ordinances, c. 28, § 19.2 (a).

Appellant claims that, on its face, this ordinance is both vague and overbroad, and therefore unconstitutional. We conclude, however, that the ordinance suffers from neither of these related infirmities.

## A. Vagueness

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.[3] Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.[4] A vague law impermissibly delegates

---

[3] E. g., *Papachristou* v. *City of Jacksonville*, 405 U. S. 156, 162 (1972); *Cramp* v. *Board of Public Instruction*, 368 U. S. 278, 287 (1961); *United States* v. *Harriss*, 347 U. S. 612, 617 (1954); *Jordan* v. *De George*, 341 U. S. 223, 230–232 (1951); *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939); *Connally* v. *General Construction Co.*, 269 U. S. 385, 391 (1926); *United States* v. *Cohen Grocery Co.*, 255 U. S. 81, 89 (1921); *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 223–224 (1914).

[4] E. g., *Papachristou* v. *City of Jacksonville, supra; Coates* v. *Cincinnati*, 402 U. S. 611, 614 (1971); *Gregory* v. *Chicago*, 394 U. S. 111, 120 (1969) (Black, J., concurring); *Interstate Circuit* v. *Dallas*, 390 U. S. 676, 684–685 (1968); *Ashton* v. *Kentucky*, 384 U. S. 195, 200 (1966); *Giaccio* v. *Pennsylvania*, 382 U. S. 399 (1966); *Shuttlesworth* v. *Birmingham*, 382 U. S. 87, 90–91 (1965); *Kunz* v. *New*

basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.[5]  Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms,"[6] it "operates to inhibit the exercise of [those] freedoms."[7]  Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."[8]

Although the question is close, we conclude that the antinoise ordinance is not impermissibly vague.  The court below rejected appellant's arguments "that proscribed conduct was not sufficiently specified and that police were given too broad a discretion in determining whether conduct was proscribed."  46 Ill. 2d, at 494, 263 N. E. 2d, at 867.  Although it referred to other, similar statutes it had recently construed and upheld, the court

---

*York,* 340 U. S. 290 (1951); *Saia* v. *New York,* 334 U. S. 558, 559–560 (1948); *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98 (1940); *Herndon* v. *Lowry,* 301 U. S. 242, 261–264 (1937).

[5] Where First Amendment interests are affected, a precise statute "evincing a legislative judgment that certain specific conduct be . . . proscribed," *Edwards* v. *South Carolina,* 372 U. S. 229, 236 (1963), assures us that the legislature has focused on the First Amendment interests and determined that other governmental policies compel regulation.  See Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 32; *Garner* v. *Louisiana,* 368 U. S. 157, 200, 202 (1961) (Harlan, J., concurring in judgment).

[6] *Baggett* v. *Bullitt,* 377 U. S. 360, 372 (1964).

[7] *Cramp* v. *Board of Public Instruction,* 368 U. S., at 287.

[8] *Baggett* v. *Bullitt, supra,* at 372, quoting *Speiser* v. *Randall,* 357 U. S. 513, 526 (1958).  See *Interstate Circuit* v. *Dallas, supra,* at 684; *Ashton* v. *Kentucky, supra,* at 195, 200–201; *Dombrowski* v. *Pfister,* 380 U. S. 479, 486 (1965); *Smith* v. *California,* 361 U. S. 147, 150–152 (1959); *Winters* v. *New York,* 333 U. S. 507 (1948); *Stromberg* v. *California,* 283 U. S. 359, 369 (1931).

below did not elaborate on the meaning of the antinoise ordinance.[9]  In this situation, as Mr. Justice Frankfurter put it, we must "extrapolate its allowable meaning." [10] Here, we are "relegated . . . to the words of the ordinance itself," [11] to the interpretations the court below has given to analogous statutes,[12] and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.[13]  "Extrapolation," of course, is a delicate task, for it is not within our power to construe and narrow state laws.[14]

With that warning, we find no unconstitutional vagueness in the antinoise ordinance.  Condemned to the use of words, we can never expect mathematical certainty from our language.[15]  The words of the Rockford ordinance are marked by "flexibility and reasonable breadth, rather than meticulous specificity," *Esteban* v. *Central Missouri State College,* 415 F. 2d 1077, 1088 (CA8 1969) (Blackmun, J.), cert. denied, 398 U. S. 965 (1970), but we think it is clear what the ordinance as a whole prohibits.  Designed, according to its preamble, "for the protection of Schools," the ordinance forbids deliberately

---

[9] The trial magistrate simply charged the jury in the words of the ordinance.  The complaint and verdict form used slightly different language.  See n. 24, *infra.*

[10] *Garner* v. *Louisiana,* 368 U. S., at 174 (concurring in judgment).

[11] *Coates* v. *Cincinnati,* 402 U. S., at 614.

[12] *E. g., Gooding* v. *Wilson,* 405 U. S. 518 (1972).

[13] *E. g., Lake Carriers Assn.* v. *MacMullan,* 406 U. S. 498, 506–508 (1972); *Cole* v. *Richardson,* 405 U. S. 676 (1972); *Ehlert* v. *United States,* 402 U. S. 99, 105, 107 (1971); cf. *Poe* v. *Ullman,* 367 U. S. 497 (1961).

[14] *United States* v. *37 Photographs,* 402 U. S. 363, 369 (1971).

[15] It will always be true that the fertile legal "imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question." *American Communications Assn.* v. *Douds,* 339 U. S. 382, 412 (1950).

noisy or diversionary[16] activity that disrupts or is about to disrupt normal school activities. It forbids this willful activity at fixed times—when school is in session—and at a sufficiently fixed place—"adjacent" to the school.[17] Were we left with just the words of the ordinance, we might be troubled by the imprecision of the phrase "tends to disturb."[18] However, in *Chicago* v. *Meyer*, 44 Ill. 2d 1, 4, 253 N. E. 2d 400, 402 (1969), and *Chicago* v. *Gregory*, 39 Ill. 2d 47, 233 N. E. 2d 422 (1968), reversed on other grounds, 394 U. S. 111 (1969), the Supreme Court of Illinois construed a Chicago ordinance prohibiting, *inter alia*, a "diversion tending to disturb the peace," and held that it permitted conviction only where there was *"imminent* threat of violence." (Emphasis supplied.) See *Gregory* v. *Chicago*, 394 U. S. 111, 116–117, 121–122 (1969) (Black, J., concurring).[19] Since *Meyer* was specifically cited in the opinion below, and it in turn drew heavily on *Gregory*, we think it proper to conclude that the Supreme Court of Illinois would interpret the Rockford ordinance to prohibit only actual

---

[16] "Diversion" is defined by Webster's Third New International Dictionary as "the act or an instance of diverting from one course or use to another . . . : the act or an instance of diverting (as the mind or attention) from some activity or concern . . . : a turning aside . . . : something that turns the mind from serious concerns or ordinary matters and relaxes or amuses."

[17] Cf. *Cox* v. *Louisiana*, 379 U. S. 559, 568–569 (1965) ("near" the courthouse not impermissibly vague).

[18] See *Gregory* v. *Chicago*, 394 U. S., at 119–120 (Black, J., concurring); *Gooding* v. *Wilson*, 405 U. S., at 525–527; *Craig* v. *Harney*, 331 U. S. 367, 372 (1947); cf. *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942) (statute punishing "fighting words," that have a *"direct* tendency to cause acts of violence," upheld); *Street* v. *New York*, 394 U. S. 576, 592 (1969).

[19] Cf. *Chicago* v. *Terminiello*, 400 Ill. 23, 79 N. E. 2d 39 (1948), reversed on other grounds, 337 U. S. 1, 6 (1949).

or imminent interference with the "peace or good order" of the school.[20]

Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted. We do not have here a vague, general "breach of the peace" ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school. Given this "particular context," the ordinance gives "fair notice to those to whom [it] is directed." [21] Although the Rockford ordinance may not be as precise as the statute we upheld in *Cameron v. Johnson,* 390 U. S. 611 (1968)—which prohibited picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from" any courthouse—we think that, as in *Cameron,* the ordinance here clearly "delineates its reach in words of common understanding." *Id.,* at 616.

---

[20] Some intermediate appellate courts in Illinois appear to have interpreted the phrase "tending to" out of the Chicago ordinance entirely, at least in some contexts. *Chicago v. Hansen,* 337 Ill. App. 663, 86 N. E. 2d 415 (1949); *Chicago v. Holmes,* 339 Ill. App. 146, 88 N. E. 2d 744 (1949); *Chicago v. Nesbitt,* 19 Ill. App. 2d 220, 153 N. E. 2d 259 (1958); but cf. *Chicago v. Williams,* 45 Ill. App. 2d 327, 195 N. E. 2d 425 (1963).

In its brief, the city of Rockford indicates that its sole concern is with *actual* disruption. "[A] court and jury [are] charged with the duty of determining whether or not . . . a school *has been disrupted* and that the defendant's conduct, [no matter what it was,] caused or contributed to cause the disruption." Brief for Appellee 16 (emphasis supplied). This was the theory on which the city tried appellant's case to the jury, Report, *supra,* n. 1, at 12–13, although the jury was instructed in the words of the ordinance. As already noted, *supra,* n. 1, no challenge is made here to the Rockford ordinance as applied in this case.

[21] *American Communications Assn.* v. *Douds,* 339 U. S., at 412.

*Cox* v. *Louisiana,* 379 U. S. 536 (1965), and *Coates* v. *Cincinnati,* 402 U. S. 611 (1971), on which appellant particularly relies, presented completely different situations. In *Cox,* a general breach of the peace ordinance had been construed by state courts to mean "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet." The Court correctly concluded that, as construed, the ordinance permitted persons to be punished for merely expressing unpopular views.[22] In *Coates,* the ordinance punished the sidewalk assembly of three or more persons who "conduct themselves in a manner annoying to persons passing by . . . ." We held, in part, that the ordinance was impermissibly vague because enforcement depended on the completely subjective standard of "annoyance."

In contrast, Rockford's antinoise ordinance does not permit punishment for the expression of an unpopular point of view, and it contains no broad invitation to subjective or discriminatory enforcement. Rockford does not claim the broad power to punish all "noises" and "diversions." [23] The vagueness of these terms, by themselves, is dispelled by the ordinance's requirements that (1) the "noise or diversion" be actually incompatible with normal school activity; (2) there be a demonstrated causality between the disruption that occurs and the "noise or diversion"; and (3) the acts be

---

[22] Cf. *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Cantwell* v. *Connecticut,* 310 U. S. 296, 308 (1940). Similarly, in numerous other cases, we have condemned broadly worded licensing ordinances which grant such standardless discretion to public officials that they are free to censor ideas and enforce their own personal preferences. *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969); *Staub* v. *City of Baxley,* 355 U. S. 313 (1958); *Saia* v. *New York,* 334 U. S. 558 (1948); *Schneider* v. *State,* 308 U. S. 147, 163–164 (1939); *Lovell* v. *Griffin,* 303 U. S. 444 (1938); *Hague* v. *CIO,* 307 U. S. 496 (1939).

[23] Cf. *Cox* v. *Louisiana,* 379 U. S. 536, 546–550 (1965); *Edwards* v. *South Carolina,* 372 U. S., at 234–237.

"willfully" done.[24]  "Undesirables" or their "annoying" conduct may not be punished.  The ordinance does not permit people to "stand on a public sidewalk . . . only at the whim of any police officer."[25]  Rather, there must be demonstrated interference with school activities.  As always, enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible.  The Rockford City Council has made the basic policy choices, and has given fair warning as to what is prohibited.  "[T]he ordinance defines boundaries sufficiently distinct" for citizens, policemen, juries, and appellate judges.[26]  It is not impermissibly vague.

## B. Overbreadth

A clear and precise enactment may nevertheless be "overbroad" if in its reach it prohibits constitutionally protected conduct.[27]  Although appellant does not claim that, as applied to him, the antinoise ordinance has punished protected expressive activity, he claims that the ordinance is overbroad on its face.  Because overbroad laws, like vague ones, deter privileged activity, our cases firmly establish appellant's standing to raise an overbreadth challenge.[28]  The crucial question, then, is

---

[24] Tracking the complaint, the jury verdict found Grayned guilty of "[w]ilfully causing diversion of good order of public school in session, in that while on school grounds and while school was in session, did wilfully make and assist in the making of a diversion which tended to disturb the peace and good order of the school session and class thereof."

[25] *Shuttlesworth* v. *Birmingham,* 382 U. S., at 90.

[26] *Chicago* v. *Fort,* 46 Ill. 2d 12, 16, 262 N. E. 2d 473, 476 (1970), a case cited in the opinion below.

[27] See *Zwickler* v. *Koota,* 389 U. S. 241, 249–250 (1967), and cases cited.

[28] *E. g., Gooding* v. *Wilson,* 405 U. S. 518 (1972); *Coates* v. *Cincinnati,* 402 U. S., at 616; *Dombrowski* v. *Pfister,* 380 U. S., at 486, and cases cited; *Kunz* v. *New York,* 340 U. S. 290 (1951).

whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments. Specifically, appellant contends that the Rockford ordinance unduly interferes with First and Fourteenth Amendment rights to picket on a public sidewalk near a school. We disagree.

"In considering the right of a municipality to control the use of public streets for the expression of religious [or political] views, we start with the words of Mr. Justice Roberts that 'Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' *Hague* v. *CIO,* 307 U. S. 496, 515 (1939)." *Kunz* v. *New York,* 340 U. S. 290, 293 (1951). See *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 152 (1969). The right to use a public place for expressive activity may be restricted only for weighty reasons.

Clearly, government has no power to restrict such activity because of its message.[29] Our cases make equally clear, however, that reasonable "time, place and manner" regulations may be necessary to further significant governmental interests, and are permitted.[30] For example, two parades cannot march on the same street simultaneously, and government may allow only one. *Cox* v. *New Hampshire,* 312 U. S. 569, 576 (1941). A demonstration or parade on a large street during rush hour

---

[29] *Police Department of Chicago* v. *Mosley, ante,* p. 92.

[30] *Cox* v. *New Hampshire,* 312 U. S. 569, 575–576 (1941); *Kunz* v. *New York,* 340 U. S., at 293–294; *Poulos* v. *New Hampshire,* 345 U. S. 395, 398 (1953); *Cox* v. *Louisiana,* 379 U. S., at 554–555; *Cox* v. *Louisiana,* 379 U. S. 559 (1965); *Adderley* v. *Florida,* 385 U. S. 39, 46–48 (1966); *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308, 320–321 (1968); *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969).

might put an intolerable burden on the essential flow of traffic, and for that reason could be prohibited. *Cox* v. *Louisiana,* 379 U. S., at 554. If overamplified loudspeakers assault the citizenry, government may turn them down. *Kovacs* v. *Cooper,* 336 U. S. 77 (1949); *Saia* v. *New York,* 334 U. S. 558, 562 (1948). Subject to such reasonable regulation, however, peaceful demonstrations in public places are protected by the First Amendment.[31] Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment.[32]

The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable."[33] Although a silent vigil may not unduly interfere with a public library, *Brown* v. *Louisiana,* 383 U. S. 131 (1966), making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved;[34] the regulation must be nar-

---

[31] *Police Department of Chicago* v. *Mosley, ante,* at 95–96, and cases cited.

[32] See generally T. Emerson, The System of Freedom of Expression 328–345 (1970).

[33] Wright, The Constitution on the Campus, 22 Vand. L. Rev. 1027, 1042 (1969). Cf. *Cox* v. *Louisiana,* 379 U. S. 559 (1965); *Adderley* v. *Florida,* 385 U. S. 39 (1966); *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968); *Tinker* v. *Des Moines School District,* 393 U. S. 503 (1969).

[34] *E. g., Schneider* v. *State,* 308 U. S. 147 (1939); *Talley* v. *California,* 362 U. S. 60 (1960); *Saia* v. *New York,* 334 U. S., at 562; *Cox* v. *New Hampshire,* 312 U. S., at 574; *Hague* v. *CIO,* 307 U. S., at 516. See generally Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1.

rowly tailored to further the State's legitimate interest.[35] Access to the "streets, sidewalks, parks, and other similar public places . . . for the purpose of exercising [First Amendment rights] cannot constitutionally be denied broadly . . . ." [36] Free expression "must not, in the guise of regulation, be abridged or denied." [37]

In light of these general principles, we do not think that Rockford's ordinance is an unconstitutional regulation of activity around a school. Our touchstone is *Tinker* v. *Des Moines School District,* 393 U. S. 503 (1969), in which we considered the question of how to accommodate First Amendment rights with the "special characteristics of the school environment." *Id.,* at 506. *Tinker* held that the Des Moines School District could not punish students for wearing black armbands to school in protest of the Vietnam war. Recognizing that " 'wide exposure to . . . robust exchange of ideas' " is an "important part of the educational process" and should be nurtured, *id.,* at 512, we concluded that free expression could not be barred from the school campus. We made clear that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," *id.,* at 508,[38] and that particular expressive activity could not be prohibited because of a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," *id.,* at 509. But we nowhere suggested that students, teachers, or anyone else has an absolute constitutional right to use

---

[35] *De Jonge* v. *Oregon,* 299 U. S. 353, 364–365 (1937); *Lovell* v. *Griffin,* 303 U. S., at 451; *Schneider* v. *State,* 308 U. S., at 164; *Cantwell* v. *Connecticut,* 310 U. S., at 307; *Cox* v. *Louisiana,* 379 U. S., at 562–564; *Davis* v. *Francois,* 395 F. 2d 730 (CA5 1968). Cf. *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960); *NAACP* v. *Button,* 371 U. S. 415, 438 (1963).

[36] *Food Employees* v. *Logan Valley Plaza,* 391 U. S., at 315.

[37] *Hague* v. *CIO,* 307 U. S., at 516.

[38] Cf. *Hague* v. *CIO, supra,* at 516.

all parts of a school building or its immediate environs for his unlimited expressive purposes. Expressive activity could certainly be restricted, but only if the forbidden conduct "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.,* at 513. The wearing of armbands was protected in *Tinker* because the students "neither interrupted school activities nor sought to intrude in the school affairs or the lives of others. They caused discussion outside of the classrooms, but no interference with work and no disorder." *Id.,* at 514. Compare *Burnside* v. *Byars,* 363 F. 2d 744 (CA5 1966), and *Butts* v. *Dallas Ind. School District,* 436 F. 2d 728 (CA5 1971), with *Blackwell* v. *Issaquena County Board of Education,* 363 F. 2d 749 (CA5 1966).

Just as *Tinker* made clear that school property may not be declared off limits for expressive activity by students, we think it clear that the public sidewalk adjacent to school grounds may not be declared off limits for expressive activity by members of the public. But in each case, expressive activity may be prohibited if it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker* v. *Des Moines School District,* 393 U. S., at 513.[39]

We would be ignoring reality if we did not recognize that the public schools in a community are important institutions, and are often the focus of significant grievances.[40] Without interfering with normal school activi-

---

[39] In *Tinker* we recognized that the principle of that case was not limited to expressive activity within the school building itself. *Id.,* at 512 n. 6, 513–514. See *Esteban* v. *Central Missouri State College,* 415 F. 2d 1077 (CA8 1969) (Blackmun, J.), cert. denied, 398 U. S. 965 (1970); *Jones* v. *Board of Regents,* 436 F. 2d 618 (CA9 1970); *Hammond* v. *South Carolina State College,* 272 F. Supp. 947 (SC 1967), cited in *Tinker.*

[40] Cf. *Thornhill* v. *Alabama,* 310 U. S., at 102. It goes without saying that "one is not to have the exercise of his liberty of

ties, daytime picketing and handbilling on public grounds near a school can effectively publicize those grievances to pedestrians, school visitors, and deliverymen, as well as to teachers, administrators, and students. Some picketing to that end will be quiet and peaceful, and will in no way disturb the normal functioning of the school. For example, it would be highly unusual if the classic expressive gesture of the solitary picket disrupts anything related to the school, at least on a public sidewalk open to pedestrians.[41] On the other hand, schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse.[42]

Rockford's antinoise ordinance goes no further than *Tinker* says a municipality may go to prevent interference with its schools. It is narrowly tailored to further Rockford's compelling interest in having an undisrupted school session conducive to the students' learning, and does not unnecessarily interfere with First Amendment rights. Far from having an impermissibly broad prophylactic ordinance,[43] Rockford punishes only conduct which disrupts or is about to disrupt normal school activities. That decision is made, as it should be, on an individualized basis, given the particular fact situation. Peaceful picketing which does not interfere with the ordinary functioning of the school is permit-

---

expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State,* 308 U. S., at 163.

[41] Cf. *Jones* v. *Board of Regents, supra.*

[42] Cf. *Barker* v. *Hardway,* 283 F. Supp. 228 (SD W. Va.), aff'd, 399 F. 2d 638 (CA4 1968), cert. denied, 394 U. S. 905 (1969) (Fortas, J., concurring).

[43] See *Jones* v. *Board of Regents, supra; Hammond* v. *South Carolina State College, supra.*

ted. And the ordinance gives no license to punish anyone because of what he is saying.[44]

We recognize that the ordinance prohibits some picketing that is neither violent nor physically obstructive. Noisy demonstrations that disrupt or are incompatible with normal school activities are obviously within the ordinance's reach. Such expressive conduct may be constitutionally protected at other places or other times, cf. *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Cox* v. *Louisiana,* 379 U. S. 536 (1965), but next to a school, while classes are in session, it may be prohibited.[45] The antinoise ordinance imposes no such restriction on expressive activity before or after the school session, while the student/faculty "audience" enters and leaves the school.

In *Cox* v. *Louisiana,* 379 U. S. 559 (1965), this Court indicated that, because of the special nature of the place,[46] persons could be constitutionally prohibited from picketing "in or near" a courthouse "with the intent of interfering with, obstructing, or impeding the administration of justice." Likewise, in *Cameron* v. *Johnson,* 390 U. S. 611 (1968), we upheld a statute prohibiting

---

[44] Compare *Scoville* v. *Board of Education,* 425 F. 2d 10 (CA7), cert. denied, 400 U. S. 826 (1970); *Dickey* v. *Alabama State Board of Education,* 273 F. Supp. 613 (MD Ala. 1967) (cited in *Tinker*).

[45] Different considerations, of course, apply in different circumstances. For example, restrictions appropriate to a single-building high school during class hours would be inappropriate in many open areas on a college campus, just as an assembly that is permitted outside a dormitory would be inappropriate in the middle of a mathematics class.

[46] Noting the need "to assure that the administration of justice at all stages is free from outside control and influence," we emphasized that "[a] State may protect against the possibility of a conclusion by the public . . . [that a] judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process." 379 U. S., at 562, 565.

picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any . . . county . . . courthouses." [47] As in those two cases, Rockford's modest restriction on some peaceful picketing represents a considered and specific legislative judgment that some kinds of expressive activity should be restricted at a particular time and place, here in order to protect the schools.[48] Such a reasonable regulation is not inconsistent with the First and Fourteenth Amendments.[49] The antinoise ordinance is not invalid on its face.[50]

The judgment is

*Affirmed in part and reversed in part.*

MR. JUSTICE BLACKMUN joins in the judgment and in Part I of the opinion of the Court. He concurs in the result as to Part II of the opinion.

MR. JUSTICE DOUGLAS, dissenting in part.

While I join Part I of the Court's opinion, I would also reverse the appellant's conviction under the antinoise ordinance.

---

[47] Quoting *Schneider* v. *State,* 308 U. S., at 161, we noted that " 'such activity bears no necessary relationship to the freedom to . . . distribute information or opinion.' " 390 U. S., at 617.

[48] Cf. *Garner* v. *Louisiana,* 368 U. S., at 202–203 (Harlan, J., concurring in judgment).

[49] Cf. *Adderley* v. *Florida,* 385 U. S. 39 (1966). In *Adderley,* the Court held that demonstrators could be barred from jailhouse grounds not ordinarily open to the public, at least where the demonstration obstructed the jail driveway and interfered with the functioning of the jail. In *Tinker* we noted that "a school is not like a hospital or a jail enclosure." 393 U. S., at 512 n. 6.

[50] It is possible, of course, that there will be unconstitutional applications; but that is not a matter which presently concerns us. See *Shuttlesworth* v. *Birmingham,* 382 U. S., at 91, and n. 1, *supra.*

The municipal ordinance on which this case turns is c. 28, § 19.2 (a) which provides in relevant part:

"That no person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof."

Appellant was one of 200 people picketing a school and carrying signs promoting a black cause—"Black cheerleaders to cheer too," "Black history with black teachers," "We want our rights," and the like. Appellant, however, did not himself carry a picket sign. There was no evidence that he yelled or made any noise whatsoever. Indeed, the evidence reveals that appellant simply marched quietly and on one occasion raised his arm in the "power to the people" salute.

The pickets were mostly students; but they included former students, parents of students, and concerned citizens. They had made proposals to the school board on their demands and were turned down. Hence the picketing. The picketing was mostly by black students who were counseled and advised by a faculty member of the school. The school contained 1,800 students. Those counseling the students advised they must be quiet, walk hand in hand, no whispering, no talking.

Twenty-five policemen were stationed nearby. There was noise but most of it was produced by the police who used loudspeakers to explain the local ordinance and to announce that arrests might be made. The picketing did not stop, and some 40 demonstrators, including appellant, were arrested.

The picketing lasted 20 to 30 minutes and some students went to the windows of the classrooms to observe it. It is not clear how many there were. The picketing

was, however, orderly or, as one officer testified, "very orderly." There was no violence. And appellant made no noise whatever.

What Mr. Justice Roberts said in *Hague* v. *CIO,* 307 U. S. 496, 515–516, has never been questioned:

> "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."

We held in *Cox* v. *Louisiana,* 379 U. S. 536, 544–545, that a State could not infringe the right of free speech and free assembly by convicting demonstrators under a "disturbing the peace" ordinance where all that the students in that case did was to protest segregation and discrimination against blacks by peaceably assembling and marching to the courthouse where they sang, prayed, and listened to a speech, but where there was no violence, no rioting, no boisterous conduct.

The school where the present picketing occurred was the center of a racial conflict. Most of the pickets were indeed students in the school. The dispute doubtless disturbed the school; and the blaring of the loudspeakers of the police was certainly a "noise or diversion" in the

meaning of the ordinance. But there was no evidence that appellant was noisy or boisterous or rowdy. He walked quietly and in an orderly manner. As I read this record, the disruptive force loosed at this school was an issue dealing with race—an issue that is pre-eminently one for solution by First Amendment means.* That is all that was done here; and the entire picketing, including appellant's part in it, was done in the best First Amendment tradition.

---

*The majority asserts that "appellant's sole claim . . . is that he was convicted under facially unconstitutional ordinances" and that there is, therefore, no occasion to consider whether his activities were protected by the First Amendment. *Ante,* at 106 n. 1. Appellant argues, however, that the ordinance is overly broad in that it punishes constitutionally protected activity. A statute may withstand an overbreadth attack "only if, as authoritatively construed . . . , it is not susceptible of application to speech . . . that is protected by the First and Fourteenth Amendments." *Gooding* v. *Wilson,* 405 U. S. 518, 520 (1972). If the ordinance applies to appellant's activities and if appellant's activities are constitutionally protected, then the ordinance is overly broad and, thus, unconstitutional. There is no merit, therefore, to the Court's suggestion that the question whether "appellant's particular behavior was protected by the First Amendment," *ante,* at 106 n. 1, is not presented.