**INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS and Bill Glick on Behalf of All Members of the International Society for Krishna Consciousness**

v.

**STATE FAIR OF TEXAS et al.**

**No. CA-3-78-1279-G.**

United States District Court,
N. D. Texas,
Dallas Division.

Oct. 9, 1979.

Jordan, Rubin & Pace by John F. Jordan, Dallas, Tex., for plaintiffs.

Joseph G. Werner, Kent S. Hofmeister, John Pratt, Asst. City Attys., Dallas, Tex., for City of Dallas.

Russell B. Smith, Dallas, Tex., for State Fair of Texas and Gallagher.

ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

Approximately one year ago this court, upon the application of plaintiff International Society for Krishna Consciousness ("ISKCON") and following a short hearing, granted a temporary restraining order enjoining the defendants and their agents from "enforcing State Fair of Texas rules, regulations, and directives insofar as these regulations attempt to confine plaintiffs to a leased booth or otherwise geographically restrict plaintiffs from freely circulating through the public areas of the Texas State Fair while engaging in 'Sankirtan,' as long as plaintiffs make clear on whose behalf any solicitation is being made." The rea-

sons for the restraining order are given in an order of the court entered on October 18, 1978 and reported at 461 F.Supp. 719 (N.D. Tex.1978).

██ The State Fair of Texas is again upon us. Once again ISKCON devotees wish to circulate freely through the fairgrounds practicing "Sankirtan," and once again State Fair officials wish to confine them to booths.[1] Last year's restraining order having expired, ISKCON has moved for a preliminary injunction enjoining State Fair officials and their agents from

> Enforcing State Fair of Texas rules, regulations, and directives insofar as these regulations attempt to confine plaintiffs to a leased booth or otherwise geographically restrict plaintiffs from freely circulating through the public areas of the Texas State Fair while engaging in "Sankirtan" as long as plaintiffs make clear on whose behalf any solicitation is made.

In the year since the temporary restraining order was issued, the legal issues applicable to this dispute have not changed. The factual record to which the law must be applied has, however, been supplemented by virtue of the following stipulations by the parties: "1) the defendant, State Fair of Texas and Wayne Gallagher (or his successor in office) are seeking to confine the plaintiffs to a booth for all of their projected activities at the 1979 Fair. 2) That the defendants State Fair of Texas and Wayne Gallagher (or his successor in office) have received inquiries from other religious groups who may wish to carry out religious distribution of literature and solicitation of donations on the same terms as the plaintiffs propose to do so during the 1979 Fair.

3) That the court may consider for the purposes of this Application for Preliminary Injunction the depositions of Harvey Mechanic dated July 25, 1979 and the deposition of Bill Glick dated July 25, 1979." In addition, some further guidance in this difficult area of the law has been provided by the Fifth Circuit's recent decision in *International Soc. for Krishna Consciousness v. Eaves*, 601 F.2d 809 (5th Cir. 1979).

### The Case Linchpin

That the Fair's interest in preserving the location clause is compelling does not mean that in weighing the state interest and the First Amendment interest that a compelling interest entry is necessarily made on the state side of the ledger. That would be true only if the ISKCON activity is not sufficiently different from the activity of the other lessees that a freeing of ISKCON would free the commercial vendors. The court in its order in 1978 explained why it believed that the interest in commercial speech of the other vendors and the interest in free exercise and expression of ISKCON were not on a parity. Rather, those interests were sufficiently different that the Fair could not argue that freeing ISKCON from the location clause would necessarily free all commercial vendors. A generally enforceable location clause is necessary to the very existence of the public forum and would by necessity outweigh the impact upon ISKCON's free exercise and expression activity. At the same time if the location clause is applicable to all but those engaging in activity on a parity with that of ISKCON, the Fair is left with little to justify the impact of the location clause upon ISKCON.[2] This was the linchpin of

---

1. Because Bill Glick, the individual plaintiff in this case, seeks relief for himself, this case may proceed, despite the plaintiffs' failure to comply with federal and local rules in seeking certification of the proposed plaintiff class. The failure to move for class certification does, however, require this court to strike the class allegations. Insofar as injunctive relief is concerned, the class action allegations are in any event superfluous. The award of injunctive relief to the individual plaintiff will perforce inure to the benefit of the proposed class of plaintiffs.

2. The State Fair also has an interest in preventing fraud on its grounds, and it might be argued

that this interest is advanced by the booth restriction. But the central purpose of the booth restriction is that of maintaining order, and to the extent that its purpose is to prevent fraud, it is much broader than necessary to achieve that purpose. See *Grayned v. City of Rockford*, 408 U.S. 104, 116–17, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Fraud can be adequately prevented by enforcement of Texas criminal law by the use of plainclothes policemen or by other means. The possibility of fraud is reduced, or course, by full disclosure of identity, and in this regard ISKCON has agreed to wear identification badges issued by the State Fair.

the court's decision last year and the issue now is whether anything has been presented to alter its conclusion. To answer this question we will further review the ISKCON activity as explicated by the addition of the depositions of Glick and Mechanic. We will then examine the intervening decision of the Fifth Circuit in *Eaves*, and finally, we will discuss the effect of "inquiries" regarding the location requirement of other religious groups.

### The Activity of ISKCON

This court wrote in its October 18, 1978 order:

> The devotees of this sect of Hinduism carry a duty to perform an evangelical ritual called "Sankirtan." It consists of spreading the "truth" and soliciting. The donations and book sales are the lifeblood of the temple, providing sole support for its temple and members. 461 F.Supp. at 723.

There is some suggestion that the evidence developed during the past year reveals that the activities of ISKCON devotees at the Fair consist solely of soliciting donations without any expression of religious beliefs, and that, consequently, their activities are essentially commercial. There is evidence to bear out this claim. To begin with, the devotees change their manner of dress when soliciting at the Fair. Most of the devotees typically wear loose-fitting clothing worn in India and most males shave their heads, leaving only a small ponytail. When soliciting at the Fair, however, many devotees wear wigs and ordinary street clothes. This fact certainly makes less plausible the plaintiffs' contention that they go to the Fair to express religious beliefs. The devotees' appearance and manner of dress is itself a kind of expression, albeit silent, of religious or philosophical principles, and the fact that the

devotees go to the Fair in disguise—in a kind of self-imposed abnegation of their beliefs—must make one wonder whether their purpose is truly religious in nature. According to the deposition testimony of William Glick, one of the devotees involved in this suit, the purpose of the disguise is "to not cause undue mental anxiety in the people we're approaching," so that they will be more willing to listen to the devotee's solicitations; without the disguise, fair patrons "wouldn't be as receptive to understanding our message in general." (Glick depo. at 53). This testimony does not significantly alter the fact that the devotees' appearance on the fairgrounds in disguise detracts from their contention that they enter the fairgrounds to spread a religious or philosophical message.

Moreover, many of the devotees engaged in soliciting neither engage in religious discussion nor distribute literature, nor even discuss the nature of their organization, but simply distribute a flower, or a small flag or a "Big Tex" button for which they seek a donation. This is essentially commercial activity (albeit with an arguably religious motivation); as noted in the October 18, 1978 order, "[t]his practice is rife with potential fraud." 461 F.Supp. at 723.

ISKCON devotees believe, as explained by William Glick in his deposition, that when a person makes a donation, he or she "is engaged in some even little way in the Lord's service," (Glick depo. at 60) and he or she is benefitted, *regardless of whether he or she understood the purpose of the donation or any of the religious precepts of ISKCON*; thus even if the donor does not know the nature or purpose of his or her donation, he or she is, according to ISKCON precepts, benefitted.[3] Whether or not this is true, it indicates that devotees are willing and, in fact, eager to accept donations without any disclosure to the donor of the reli-

---

3. The following excerpts from Glick's deposition testimony are instructive:

A. [Glick] Okay. The necessity for the devotee to speak some transcendental knowledge of God in a situation where his distrib-

uting flowers or books at a fast rate who approaches as many people as possible, there's no necessity, actually, for the devotee to say anything. 'Cause according to both Christian and Hindu theology, the Lord is

gious or philosophical purposes for which the donation is sought. There is evidence, then, that at least part of the activity engaged in by ISKCON devotees at the Fair consists of solicitation without expression of religious or philosophical views.

On the other hand, on the record before the court, it must be accepted as true that some expression of religious beliefs is made by the devotees at the Fair. Glick testified that one of the reasons why religious literature was not always distributed was because State Fair officials had denied ISKCON devotees a place to store their books and magazines. Glick also testified that the devotees' "purpose for coming on the grounds, the main thing, was to distribute literature and collect donations for it in an unconfined manner." (Glick depo. at 54). He also testified that when devotees' meet "somebody whose body language is receptive . . . [devotees] take time out" and, presumably, engage in religious discussion. Thus the devotees' activity at the Fair must be viewed as an admixture of religious expression and pure solicitation of money carried out to discharge a religious duty.

### The Eaves Decision

In one sense, the Fifth Circuit in Eaves was faced with a more neatly-focused analytical problem. The ordinance challenged there did not prohibit solicitation or proselytizing in most parts of the airport, but simply required that acceptance or receipt of donations take place in specified booths. The ordinance did not regulate speech, or proselytizing, or even pure solicitation; it regulated only transfers of money, which the court found to be only "the medium, not the message." 601 F.2d at 828. Thus while the regulation challenged in Eaves, like that challenged here, operated as a place restriction on activities, it was a far narrower place restriction than that involved

here, applying only to the *transfer* of money and not to solicitation, proselytizing, or the like. The Fifth Circuit found the regulation reasonable because it made "a very substantial contribution to the pursuit of an important goal consisting of three specific ·ends—fairness, ease of enforcement, and reduced disruption. Considered as such, on this record, its benefits outweigh the burdens it places on religious practices." 601 F.2d at 830. *Eaves* also differed materially in the state necessity for the restriction. Twenty to thirty Hare Krishnas on a several hundred acre tract housing one of the largest state fairs in the country does not pose problems similar to the problem posed by the presence of devotees in the corridors of one of the world's most active air terminals. ·

In sum, *Eaves* sustained as reasonable a restriction upon ISKCON's raw exchanges of money, a significantly more tailored and less severe impact than that posed by the Fair's booth confinement. Moreover, the impact was upon an activity arguably closer to plain commercial activity. Not only was there less restriction in *Eaves*, there was plainly far greater justification for it. Thus the intervening decision of *Eaves* does not change this court's view. To the contrary, by emphasis upon what was not done at the Atlanta airport, the decision further supports ISKCON's argument here.

### Inquiries of Other Groups

■ It is true that the parties have stipulated that other religious groups have inquired into the possibility of escaping the location clause. To the extent that this suggests that a greater number of persons might be engaged in religious activities, thereby causing greater confusion, there may be an incremental increase in the Fair's justification for time and place control. This speculation is not sufficient to

---

sitting within the heart and so the devotee engaging some particular materialistic person in the Lord's service, the Lord is actually directing him to give a donation or don't . . . .. So when you meet somebody

whose body language is receptive and they're vocal and receptive, then you take time out. But otherwise, the Lord is making all the arrangements. (Glick depo. at 65, 66).

materially affect this weighing exercise. Of course, should the numbers of persons similarly situated to ISKCON increase to a point that the Fair's midways become populated with various religious groups soliciting donations and distributing literature, the flow of patrons through the fairgrounds could at some point become unacceptably impeded. That factual circumstance could, by application of the same calculus applied here, result in a finding that the Fair's restriction upon the time and manner of that activity is justified. On this record, however, there is little, if any, justification for the proposed restriction.

The application for a preliminary injunction with the same terms as the temporary restraining order is GRANTED. It will be effective immediately upon the posting of a bond in an amount and form to be agreed upon by the parties. Failing agreement, the court will set the bond amount and its terms.