GREEN FOR WISCONSIN and Mark Green,
Petitioners,

v.

STATE of Wisconsin ELECTIONS BOARD
and Kevin J. Kennedy, in his official capacity as
Executive Director of the State of Wisconsin
Elections Board, Respondents.

Supreme Court

*No. 2006AP2452–OA. Decided April 25, 2007.*

2007 WI 45

(Also reported in 732 N.W.2d 750.)

The Court entered the following order on this date:

The parties have agreed that this case may be dismissed, with prejudice, without costs, and without further notice to any party.

IT IS ORDERED that the original action is dismissed, with prejudice and without costs to any party.

¶ 1. N. PATRICK CROOKS, J. (*concurring*). While I concur in the order dismissing this matter, based on the unopposed motion of the petitioners, I write in order to respond to the lengthy concurrence of Justice David T. Prosser.

¶ 2. Several years ago, Grant County Circuit Court Judge Richard W. Orton, a distinguished trial judge, ordered summary judgment in a case. In doing so, he characterized the plaintiffs' case as "hogwash, pure hogwash." That phrase aptly fits those portions of the concurrence of Justice Prosser where he denigrates the actions of members of this court. The following unfair and inaccurate phrases are used in his concurrence: the court "used every imaginable pretext to avoid making a decision" (¶ 16); the "court did not care" (¶ 17); was "indifferent" to the facts of the case (¶ 23); was "overwhelmed by the difficulty of the facts and issues" and "threw up its hands" (¶ 28).

¶ 3. The fact is that this court spent many, many hours working on the petition asking to commence an original action, as well as on the various submissions of the petitioners, the respondents, and the amicus. The October 31, 2006 order of this court accurately sets forth the extensive efforts that were made to try to get this matter into an appropriate posture, so that a decision could be made as to whether to grant the petition, and thus, take this case invoking our original jurisdiction. We did, of course, ultimately take the case once there were no factual disputes. This court grants

petitions for original jurisdiction " 'with the greatest reluctance . . . especially where questions of fact are involved . . . .' " *Petition of Heil,* 230 Wis. 428, 436, 284 N.W. 42 (1939) (citing *State ex rel. Hartung v. City of Milwaukee,* 102 Wis. 509, 78 N.W. 756 (1899)).

¶ 4.   The March 12, 2007 order of this court came in response to the changes brought about by the legislature and the governor in eliminating the State Elections Board and the State Ethics Board, and in creating a new Government Accountability Board. That new board has the authority to review, and, by its action or inaction, to affirm or nullify decisions by the two boards that were eliminated. *See* 2007 Wis. Act 1, § 209(2)(e). The settlement of this case came shortly after we issued that order, asking the parties whether oral argument should be scheduled despite the changes, or whether it was prudent to wait until the new Government Accountability Board had an opportunity to act or decline to act.

¶ 5.   Much is made in the concurrence of Justice Prosser about how this court was *once* a "great court," and how we no longer fit that description. Justice Prosser's concurrence, ¶¶ 16, 37. In order to be a "great court," I believe that the members of such a court must be persons who care deeply about truth, justice, and fairness. I have great respect for my colleagues on the Wisconsin Supreme Court, but it is for others, not for us, to judge whether we continue to be a "great court." What I observed in the handling of this case by my colleagues convinced me that each of them cared deeply about truth, justice, and fairness for the parties. To denigrate, now, their actions is wrong and I must, therefore, respond to such unfair and inaccurate characterizations of the court and its actions in this case. Accordingly, I respectfully concur.

¶ 6. DAVID T. PROSSER, J. (*concurring*). The petitioners, Green for Wisconsin and Mark Green, move this court for an order to dismiss their original action. Their motion is based upon a Stipulation of the parties to settle the case. The petitioners' motion was filed by an assistant attorney general representing the respondents, which underscores the settlement agreement. In view of the settlement, I reluctantly concur in the Order to dismiss the action. Nonetheless, because this case always warranted the court's urgent attention, I believe additional comment is necessary.

I

¶ 7. There have been many notable cases in the history of this court. By all accounts, one of the most significant was *The Attorney General ex rel. Bashford v. Barstow*, 4 Wis. 567 (1856). *See* Joseph A. Ranney, *Trusting Nothing to Providence* 84–88 (1999); John Bradley Winslow, *The Story of a Great Court* 96–107 (1912). The case involved a disputed election for governor in which the court in essence removed a governor from office.

¶ 8. In 1855 Governor William A. Barstow ran for re-election. Although his party dominated Wisconsin politics, Barstow had apparently antagonized many voters, and he ran well behind the rest of the ticket. The election was very close and remained unresolved for weeks. On December 17, 1855, the last day allowed by law, the state board of canvassers certified Barstow's reelection by 157 votes. Winslow, *supra,* at 97.

¶ 9. Barstow's opponent, Coles Bashford, claimed fraud. He asserted that slow returns from Chippewa, Waupaca, and several other northern counties contained fictitious precincts and manufactured votes.

167

Winslow, *supra,* at 97, 101. Bashford moved to file a writ of quo warranto in the supreme court, challenging Barstow's election and his right to hold the office of governor. Winslow, *supra,* at 99.

¶ 10.   The newly elected attorney general took control of the quo warranto so that a member of Barstow's party could manage the action. Eventually, however, he stepped aside. Winslow, *supra,* at 99, 101.

¶ 11.   Barstow vigorously opposed the court's jurisdiction to hear the case. Winslow, *supra,* at 102. When the court decided otherwise, Barstow refused to file a substantive answer, thereby permitting a default judgment. Barstow's attorneys withdrew after delivering a communication from Barstow threatening to resist any removal order from the court "with all the force vested in this department." Winslow, *supra,* at 104–05.[1]

¶ 12.   The court was not deterred. Rather than enter a default against Barstow, however, it required Bashford to make his proofs and demonstrate his title to office. He did. Winslow, *supra,* at 106. Once the "irregularities and fraudulent returns were amply proven," the court entered judgment. Winslow, *supra,* at 106. Several days before judgment, Barstow resigned,

---

[1] As Justice Winslow later wrote: "This was plainly a threat of armed resistance in case the Court proceeded to seat Bashford. Especially significant was the threat in view of the fact that arms were known to have been stored in the state house for use in case of an emergency." John Bradley Winslow, *The Story of a Great Court* 105 (1912). Joseph Ranney adds: "Tensions ran high. Militia units from areas supporting Barstow came to Madison for his inauguration and stayed to fight for him if necessary." Joseph A. Ranney, *Trusting Nothing to Providence* 84 (1999).

transferring the office to the lieutenant governor who promptly honored the court's order. Winslow, *supra,* at 107.

¶ 13.    In explaining the court's jurisdiction to decide this "political case," Chief Justice Edward Whiton observed that the court "is the mere instrument provided by the constitution to ascertain and enforce [Bashford's and Barstow's] rights as fixed by that instrument. Its office is the same as in all controversies between party and party; not to create rights, but to ascertain and enforce them." Ranney, *supra,* at 85 (quoting *Bashford,* 4 Wis. at 659).

¶ 14.    Throughout the proceedings, the court was united. Justice Abram D. Smith, a member of Barstow's party, wrote on every important issue before the court. Future Chief Justice Edward G. Ryan, also a member of Barstow's party, played a leading role in arguing and proving Bashford's case. Ranney, *supra,* at 84; Winslow, *supra,* at 99.

¶ 15.    The case of *Bashford v. Barstow,* according to historian Joseph A. Ranney, "conclusively established [the Supreme Court's] role as the final interpreter of the law." Ranney, *supra,* at 84. It also assured the integrity of the electoral process. It thus represented a pivotal moment in Wisconsin legal history.

## II

¶ 16.    *Bashford v. Barstow* was decided more than a century-and-a-half ago. We live now in different times. If there is ever a sequel to Justice Winslow's *The Story of a Great Court,* the *Green* case will not be included. In the midst and aftermath of an important gubernatorial election, this court did nothing to ascertain and enforce

rights, or to assure the integrity of the electoral process. Instead, it used every imaginable pretext to avoid making a decision.

¶ 17. Some citizens believe that petitioner Green and his committee were campaign violators, even though the Elections Board deprived them of the opportunity to use lawfully collected, publicly reported political contributions in Green's campaign. Other citizens believe that Green was the victim of an abuse of government power. No matter how one sees it, history will show that this court did not care.

¶ 18. From the outset, Green contended that he and his committee had complied in every respect with existing state and federal law. The Elections Board now stipulates that:

> [W]hen Green for Wisconsin . . . converted the disputed funds from Petitioner Mark Green's federal campaign committee to his state campaign committee on January 25, 2005, it complied with: (1) previous Board determinations with respect to similar matters; (2) ElBd 1.39, as written and interpreted at the time; and (3) instructions provided by the Board's staff.

¶ 19. What more is there to say? When the parties also "acknowledge that the Board's position in this litigation was based on the Board's *current* interpretation of the relevant statutes," the parties acknowledge an irrelevancy. (Emphasis added.)

¶ 20. This court recognized in *Elections Board v. Wisconsin Manufacturers & Commerce,* 227 Wis. 2d 650, 597 N.W.2d 721 (1999), that retroactive rulemaking—at least in the area of speech—is a violation of due process of law. This court said: "Because we assume that [persons are] free to steer between lawful and unlawful conduct, we insist that laws give the

170

person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly." Id. at 676–77 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)). "Such notice is a basic requirement of due process." Id. (citing *Grayned,* 408 U.S. at 108).

¶ 21.   The court went on: "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." Id. at 677 (quoting *Buckley v. Valeo,* 424 U.S. 1, 41 n.48 (1976)).

¶ 22.   When Justice Department attorneys were called upon to defend the Elections Board's rules and "order," they were not content with trying to defend retroactive rulemaking. They publicly and repeatedly accused Green of violating federal law, a position that directly contradicted the Elections Board's formal interpretation of federal law.[2] This astounding and disturb-

---

[2] The Elections Board's explanation of its emergency rule reads in part:

> *The Elections Board finds that an emergency exists in the recent change in federal law that permits the transfer of the funds in a federal candidate campaign committee's account to the candidate's state campaign committee account ....*

> In November, 2004, Congress amended the Federal Election Campaign Act ... to permit the transfer of a federal candidate's campaign committee's funds to the candidate's state campaign committee, if state law permitted, and subject to the state law's requirements and restrictions.

> Because of Congress' action in November, 2004, money which had not been available to a state committee under BICRA, and which might not have qualified for use for political purposes in a state campaign because of its source or because of other noncompliance with state law, could now be transferred to a state committee, if state law permitted. *Wisconsin law, under the Board's current rule, E1Bd 1.39 Wis. Adm. Code, allows for*

ing position may be the reason why former Attorney General Peggy Lautenschlager's name is conspicuously missing from all the briefs Department attorneys filed in this case.

¶ 23. To these hard facts the court has been indifferent. The extensive procedural history of this case is set out below.

¶ 24. On October 9, 2006, Green filed a petition for an original action in this court.

¶ 25. On October 11, 2006, this court responded promptly by issuing two orders. One ordered the Elections Board to file a response by October 16, 2006. The other ordered Green to secure and transfer to this court records from the Elections Board relating to its proceedings, its Emergency Rule of January 26, 2005, and its September 6, 2006, "order," as well as all papers and transcripts from Green's unsuccessful effort to obtain an injunction against the Board's "order" in the Dane County Circuit Court (Case No. 2006CV3055).

¶ 26. On October 18, 2006, this court ordered the petitioners and respondents to file answers to 11 questions by October 19, 2006. *See* Appendix A.

¶ 27. On October 31, 2006, the court issued a third order. 2006 WI 120, 297 Wis. 2d 300, 723 N.W.2d 418. The order stated that:

> The court has worked diligently to assess and determine the legal and factual issues presented by the parties and to reach a consensus on how to proceed; we have explored the difficult substantive and procedural issues in an attempt to bring order out of complex and confusing filings, *all to no avail.* (Emphasis added.)

---

*conversion of federal campaign committees, and their funds, to a state campaign committee without regard to the source of those funds and without regard to contribution limitations.* (Emphasis added.)

172

¶ 28.    Seemingly overwhelmed by the difficulty of the facts and issues, the court threw up its hands and ordered the petitioners to file an amended petition "in the form of a complaint which, in numbered paragraph form, specifies the precise facts and legal theories upon which they rely." The respondents were then ordered to answer the new "complaint." The order stated that the court would then submit these documents to a reserve judge who would determine "what factual issues are in dispute and whether they relate to the identified legal issues." The court went on at length about the alleged jumble of disputed facts:

> This court has on two occasions issued orders asking the parties to clarify the facts upon which the court would have to resolve the matter and to identify disputed facts, if any. It appears from the parties' submissions in response to those orders that there are truly contested issues of fact.
>
> The parties do not appear to agree on what facts are relevant, nor do they agree on the characterization of many facts. The parties' stipulation of facts was for the circuit court proceeding and it does not cover all of the facts at issue here. The respondent says the only relevant facts are the Elections Board's record in creating the emergency rule and issuing the September 6, 2006 order. Petitioners say that the court must also consider the history of the Elections Board's actions regarding previous "conversions" of federal campaign accounts to state campaign accounts. Petitioners' "record" for purposes of an original action would apparently consist of the "record" transmitted by the Dane County Circuit Court from the earlier circuit court case, the Elections Board record, documents regarding the complaint filed with the Federal Election Commission, and "factual assertions offered by the parties." In response, although the respondent's filings have cited certain paragraphs in the petitioners' filings to which it

173

takes exception, it has failed to identify clearly the specific factual allegations that it allegedly disputes. The parties' seemingly inconsistent statements on the existence of disputed factual issues impinges upon this court's ability to evaluate at this point in time whether the case is of the type that should be resolved through the court's original jurisdiction, which is designed to resolve important legal questions but not to referee factual disputes.

¶ 29. Three justices dissented from this order. Justice Jon Wilcox wrote: "Further pleadings and factual development will not shed any more light on whether this court should decide to exercise its original jurisdiction. . . . Further pleadings are unnecessary." *Green,* 300 Wis. 2d 164, ¶¶ 2, 4 (Wilcox, J., dissenting). Justice Patience Roggensack wrote: "Neither further factual development nor further pleading is necessary for this court to decide whether to exercise its original jurisdiction. . . . The . . . order unnecessarily delays making a decision on this issue until after the November 7, 2006 election . . . ." Id., ¶¶ 23, 24 (Roggensack, J., dissenting).

¶ 30. On November 8, 2006, the court issued an order appointing the Honorable William F. Eich to conduct the proceedings described in its October 31, 2006, order.

¶ 31. On December 12, 2006, Judge Eich issued his report. He noted that petitioners' amended petition listed "thirty separate paragraphs" reciting facts. He stated that "Respondents admit each of the thirty factual allegations of the Amended Petition." He stated that the parties agreed on the legal issues. Then he declared: "The parties have agreed and represented that *the material facts* necessary to determination of the

174

above issues *are,* as contained in the pleadings, *matters of record and,* in any event, *are undisputed."* (Emphasis added.) *See* Appendix B.

¶ 32. Six weeks later, on January 23, 2007, the court issued a fourth order, accepting original jurisdiction, setting a briefing schedule, and enumerating eight issues. *See* Appendix C.

¶ 33. On March 12, 2007, the court issued a fifth order, asking the parties whether it was "desirable and prudential to delay oral arguments in this matter until the [newly created] Government Accountability Board has acted." *See* Appendix D. This order hinted at delaying argument until late 2007 or even 2008.

¶ 34. Four days later, the parties settled the case and filed a motion to dismiss.

¶ 35. At no time did the court schedule oral argument.

¶ 36. This procedural record speaks for itself.

¶ 37. If there is ever a sequel to *The Story of a Great Court,* this case will not be included. But with many more cases like this one, there is not likely to be a sequel.