STATE of Minnesota, CITY OF
MINNEAPOLIS, Petitioner,
Appellant,

v.

Theora REHA, Respondent.

No. CX–90–2372.

Supreme Court of Minnesota.

April 24, 1992.

Hubert H. Humphrey, III, Atty. Gen., St.
Paul, and Robert J. Alfton, Minneapolis
City Atty., and William J. Korn, Asst. City
Atty., Minneapolis, for appellant.

Stan Nathanson, Minneapolis, for respondent.

Gloria R. Mitka, Sidley & Austin, Chicago, Ill., for amicus curiae, Bldg. Officials &
Admin. Inter., Inc.

OPINION

YETKA, Justice.

This case involves the constitutionality of Minneapolis, Minn., Code of Ordinances § 244.690 (1990). That section provides:

Every occupant of a dwelling or dwelling unit shall keep in a clean and sanitary condition that part of the dwelling unit, and premises thereof which that person occupies or controls.

*Id.* In September 1990, a jury convicted Theora Reha for "failure to clean a dwelling" under the ordinance. In October 1990, the trial court sentenced Ms. Reha to 35 days in jail or a $700 fine. The sentence was stayed pending the exhaustion of Ms. Reha's appeals. The court of appeals reversed the conviction, holding that the ordinance's "clean and sanitary condition" language was unconstitutionally vague as applied to Ms. Reha's conduct. *State v. Reha,* 474 N.W.2d 360 (Minn.App.1991). We now reverse the court of appeals' decision and reinstate Ms. Reha's conviction.

In November 1989, the Minneapolis Health Department received an anonymous complaint about "a lot of clutter" inside respondent's house in south Minneapolis. Upon arrival at the residence, Minneapolis Environmental Health Inspector Rebecca Wyrick discovered "severe clutter" in the yard and "some maintenance problems." Inspector Wyrick testified that there was "clutter up to four feet" on the front porch so that the front door could not be opened. The back porch and yard also contained boxes, clothing, and "more clutter." Inspector Wyrick asked respondent for permission to inspect the house's interior; respondent refused and told Inspector Wyrick to "get off the property."

On December 1, 1989, Inspector Wyrick returned to respondent's home with a search warrant. Inspector Wyrick was accompanied by a police officer, her supervisor in the health department, and a housing department supervisor. Following the inspection, Inspector Wyrick issued respondent the following cleaning and pest control order:

You are hereby notified to complete the following orders at 4519 Blaisdell Avenue on or before December 7, 1989 to correct the conditions which are in violation of City of Minneapolis ordinances. We ask your cooperation so that legal action will not be necessary.

1. Remove clutter from entire dwelling to make all means of egress accessable. 244.960.[1]
2. Remove clutter from entire dwelling to remove vermin harborage. 244.-690.
3. Rid entire premises of cockroaches. Use a professional licensed pest control operator. 244.600.[2]

/s/ R. Wyrick

Inspector Wyrick also issued Ms. Reha a Notice of Condemnation, declaring her house "unfit for human habitation and dangerous to life and health because of 'severe clutter [and] vermin infestation.'" The notice required respondent either to clean up or vacate the premises.

Inspector Wyrick made several attempts to re-inspect the interior of the premises after the initial inspection on December 1, 1989. Respondent refused Inspector Wyrick entry on each of these attempts. Inspector Wyrick replaced condemnation placards on both the front and back of respondent's house each time she attempted to re-inspect the house. At the time of trial, Inspector Wyrick had replacarded re-

1. Section 244.960 provides in pertinent part:
   Every habitable unit shall have a safe unobstructed means of egress. * * *
   *    *    *    *    *    *
   (j) Any required means of egress exposed to the elements shall be kept clear of rubbish * * *.

2. Section 244.600 provides:
   Every owner of a dwelling containing two (2) or more dwelling units shall be respon-

sible for the extermination of insects, rodents, vermin, or other pests on the premises. Whenever infestation exists in two (2) or more of the dwelling units in any dwelling * * * extermination thereof shall be the responsibility of the owner. The director of inspections may order the extermination done by a person licensed to do such work * * * when in the director's opinion the infestation is widespread and severe.

spondent's house with condemnation notices nine separate times.

On January 29, 1990, Inspector Wyrick issued the respondent a ticket for her failure to comply with the cleaning order of December 1. When the respondent failed to comply with the ticket by vacating the premises, the health department turned the matter over to the Minneapolis City Attorney's Office. On March 12, 1990, the city filed a complaint against the respondent, charging her with violating section 244.690 by "fail[ing] to keep in a clean and sanitary condition that part of the dwelling unit and premises thereof which she occupied or controlled."

At trial, the state presented twelve photographs taken during the December 1, 1989, inspection. Many of the photos show rooms where clothing is piled several feet high, partially blocking doors and windows. In some of the photos, plaster walls appear crumbling and dirty. Another depicted an unflushed and dirty toilet, surrounded by stained clothing and rubbish. Another showed an apple cider bottle on a stairway that, according to Inspector Wyrick, contained what smelled and looked like urine. Finally, two photos show clothing and boxes piled on the back porch and in the back yard.

The state also called David Nordmeyer, supervisor of the environmental control section of the Minneapolis Health Department. He was one of the people who had accompanied Inspector Wyrick on the December 1, 1989 inspection. His observations at that time were "typical of what we had seen in past involvement with Ms. Reha, trash, rubbish, garbage piled at various heights throughout the house, evidence of vermin, and a house that's not kept in a sanitary condition nor maintained structurally." Nordmeyer also testified that the clothing he saw on December 1, 1989, "was infested with vermin of various kinds * * *. If by being dirty you mean did it have roach droppings on it, the clothing that I was looking at had that appearance. Not necessarily every piece, but overall." Finally, the following exchange took place:

Q. What is your understanding of the meaning of clean and sanitary conditions?

A. That we can see the floor and there are not vermin present. That seems to be the standard of the community.

Q. How are you aware that that's the standard of the community?

A. Because I believe most people live where they see the floor and don't have vermin in their homes.

On the second day of trial, respondent testified in her own behalf. On direct examination, respondent was shown the photographs taken during the December 1, 1989 inspection. She was asked to explain what was depicted in each photograph. She claimed that all the clothing in the photographs was clean or in the process of being cleaned. The crumbling sheetrock was explained as one of many ongoing renovations in the house. Empty pop bottles were used as "little miniature greenhouses." According to respondent, the apple cider bottle on the stairway indeed contained apple cider, not urine.

The last witness was Michelle Reha, respondent's 19–year–old daughter who was living with respondent at the time of the inspection. Michelle's testimony mirrored that of her mother regarding each of the photographs. According to Michelle, all the clothing was clean and in the process of being packed away for needy relatives in Iowa. Similarly, the empty pop bottles were used for "plants and stuff" and "wouldn't have been dirty, I don't think." One of the pictures showed the bathroom "being remodeled," which explained the crumbling plaster and makeshift wall.

The jury weighed this evidence and returned a verdict convicting respondent of violating section 244.690. Respondent challenges the validity of her conviction by arguing that section 244.690 is unconstitutionally vague.

The void-for-vagueness doctrine requires that a legislative enactment define a criminal offense with sufficient definiteness and certainty that "ordinary people can understand what conduct is prohibited and in a manner that does not encourage

arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *see also State v. Newstrom,* 371 N.W.2d 525, 528 (Minn.1985). However, the vagueness doctrine is based in fairness and is not designed to "convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972); *see also Grayned v. City of Rockford,* 408 U.S. 104, 110 n. 15, 92 S.Ct. 2294, 2300 n. 15, 33 L.Ed.2d 222 (1972) ("It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be a nice question'." (citation omitted)). Finally, "[c]ondemned to the use of words, [the court] can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300. An ordinance that is flexible and reasonably broad will be upheld if it is clear what the ordinance, as a whole, prohibits. *Id.*

■ In this case, Ms. Reha challenges the Minneapolis ordinance as applied to her conduct for its failure to provide fair warning of what conduct is prohibited and "to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement'." *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974) (citations omitted). Ms. Reha lacks standing to bring a facial challenge to the ordinance for two reasons: First, the ordinance does not reach constitutionally protected conduct. *Kolender,* 461 U.S. at 358–59 n. 8, 103 S.Ct. at 1859 n. 8. In addition, "a plaintiff who engages in *some conduct* that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982)

(emphasis added). In our view, at least *some* of the testimony about the December 1, 1989 inspection, as weighed by the jury, described conduct which is "clearly proscribed" under the statute; thus, Ms. Reha lacks standing for a facial challenge.

Accordingly, to prevail on her unconstitutional-as-applied claim, Ms. Reha needs to show that the statute was impermissibly vague as applied to her own behavior. The void-for-vagueness doctrine does not allow "one who has received fair warning of the criminality of his own conduct from the statute in question * * * to attack it because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit." *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974).

■ In light of the facts of the case at hand, we think the ordinance withstands constitutional scrutiny. In addressing the constitutionality of the ordinance as applied to Ms. Reha's conduct, the court of appeals should have considered whether Ms. Reha *actually* received "fair warning of the criminality" of her conduct from the statute and whether the state *actually* enforced the ordinance against her in an arbitrary and discriminatory manner. We conclude that Ms. Reha received fair warning of what the ordinance prohibits and that the city did not apply the ordinance in an arbitrary or discriminatory manner in this case.

In defining the degree of certainty and definiteness required of a statute, we have required that "ordinary people [be able to] understand what conduct is prohibited." *Newstrom,* 371 N.W.2d at 528. Further, "where a statute imposes criminal penalties, a higher standard of certainty of meaning is required." *Id.* (*citing Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8). Moreover, we consider the nature of the enactment (*e.g.,* regulation of individuals versus businesses) in evaluating the degree of certainty required. *Village of Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. at 1193.[3] The most important factor

---

**3.** For example, economic regulation is subject to a "less strict vagueness test because its subject

in determining the degree of certainty required, however, is whether the law "threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499, 102 S.Ct. at 1193. In this case, we believe the ordinance meets the fair-warning requirements of certainty. No one alleges, nor do we believe, that the ordinance threatens constitutionally protected rights. In addition, we think that most reasonable people could agree on an acceptable standard of "clean and sanitary" in the context of a housing code ordinance.

We also think that the "fair-warning" prong of the vagueness analysis was met in this case by the notice provisions built into the Minneapolis Code of Ordinances. In enforcing the "clean and sanitary" language of section 244.690, the city applies specific subsections of the ordinance dealing with rubbish and garbage,[4] vermin and pest control,[5] and other provisions detailing fire or health dangers.[6] Furthermore, the city prosecutes violations of the code as a last resort. A prosecution occurs only after an individual fails to comply with the other enforcement provisions in the code.

For example, section 244.150 ensures that written notice be given where an inspector "determines that there has been a violation, or that there are reasonable grounds to believe that there has been a violation," of the housing, health, or fire codes. The inspector's judgment cannot be viewed in a vacuum. A notice of a violation or "reasonable grounds to believe that there has been a violation" must be considered notice of *something* in the absence of any showing that the enforcement is arbitrary, discriminatory, or harassing. When an individual receives notice of an alleged violation, he or she is given a reasonable amount of time to comply with the required repair or cleanup. Here, Ms. Reha was given *several* notices, both orally and in writing, which detailed specific viola-

tions of the code. In addition, Ms. Reha had more than "reasonable time" to comply with the orders: Nearly 2 months elapsed between the time of the inspection and the ticket; another month elapsed before the complaint was filed.

Finally, the *potential* for arbitrary and discriminatory enforcement is a legitimate concern with respect to any law. However, no evidence was introduced *in this case* to indicate whether the city enforced the ordinance in an arbitrary or discriminatory manner. *See Village of Hoffman Estates*, 455 U.S. at 503, 102 S.Ct. at 1195 (if the language of an ordinance is sufficiently clear, "the speculative danger of arbitrary enforcement does not render the ordinance void for vagueness"). It is uncontroverted that the city gave notice of the alleged violations and time to remedy them. There was no showing that the health department singled out Ms. Reha—the inspection followed an anonymous complaint. Only after Ms. Reha failed to comply with the cleaning order and ticket did the city prosecute her. Ms. Reha herself never alleged that the ordinance was actually enforced in an arbitrary or discriminatory manner. Thus, " '[a]lthough it is possible that specific future applications ... may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise.' " *Village of Hoffman Estates*, 455 U.S. at 504, 102 S.Ct. at 1196 (*quoting Joseph E. Seagram & Sons, Inc. v. Hostetter*, 384 U.S. 35, 52, 86 S.Ct. 1254, 1265, 16 L.Ed.2d 336 (1966)).

In sum, the most explicit enforcement guidelines are required where a statute or ordinance threatens constitutionally protected rights. *Village of Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193. Here, the ordinance does not threaten constitutional rights or contain any other broad invitation to discriminatory enforcement. *See id.* In addition, the notice pro-

---

matter is more often narrow, and because businesses * * * can be expected to consult relevant legislation in advance of action." *Village of Hoffman Estates*, 455 U.S. at 498, 102 S.Ct. at 1193.

**4.** Sections 244.700 (rubbish), 244.710 (garbage).

**5.** Sections 244.600 (pest control by owners), 244.730 (pest control by occupants).

**6.** *E.g.*, sections 244.350 (rubbish storage), 244.-400–460 (light, heating and ventilation requirements), 244.890–1010 (fire protection).

visions in the code provide fair warning to an individual who wishes to avoid prosecution for an alleged violation. Specific sections of the ordinance cannot be viewed in isolation. The code must be read as a whole and considered in light of both its intent and its application by the city. The policy considerations underlying that intent and application mandate our result in this case. In a heavily populated urban area, the rights of those living around Ms. Reha—her neighbors—must be respected. The city has a legitimate interest in keeping the filth, debris, and trash of one property from invading another where there is a likelihood that vermin infestation threatens the entire neighborhood. Finally, Ms. Reha's conduct in this case is unreasonable to others in the same sense that, in the words of Justice Holmes, one may not "falsely shout[ ] fire in a theater." *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919).

Therefore, we hold that the ordinance is constitutional as applied to Ms. Reha's conduct. The ordinance, when read in conjunction with the entire code, provides fair warning of what conditions are unclean or unsanitary, and there is no evidence that the statute was applied in an arbitrary or discriminatory fashion.

The court of appeals' decision is reversed.

GARDEBRING, Justice (dissenting).

I respectfully dissent. The City of Minneapolis has at least two specific ordinances under which it could have charged and perhaps convicted Ms. Reha. Instead, the city decided to rely solely on an ordinance requiring property owners to keep their premises "clean and sanitary." The majority strives valiantly to find specific meaning in that meaningless phrase, but the quest is futile. The "clean and sanitary" terminology is hopelessly vague and makes the Minneapolis ordinance unconstitutional.

The majority concedes that "clean and sanitary" is not capable of precise definition but tries to sidestep that problem by arguing: (1) that Ms. Reha's house was not "clean and sanitary" by any definition; (2) that any vagueness in the ordinance did not infringe on any important rights held by Ms. Reha; and (3) that any vagueness problems were cured by the city inspector giving specific instructions on what was needed for compliance with the city code. In my view, however, those justifications are not supported by the law or the facts, and none can save this fatally flawed ordinance.

### Definitions

"Clean" and "sanitary" are relative terms, inherently incapable of precise definition. Most people would agree that a room which is vacuumed, dusted and washed once a week is "clean." But the same room would be filthy when compared with the dust-free, ionized atmosphere of a high-tech white room where white-coated, masked, bespectacled technicians assemble micro-electronic components. Similarly, a room that is scrubbed, vacuumed and dusted every two weeks, or once a month or once every three months may be "clean" by some standards and hopelessly dirty by others. It is all in the eye of the beholder. Try as it might, the majority cannot change the simple fact that there is no uniform definition of "clean."

Similarly, the meaning of "sanitary" changes with the context. Does one microbe of bacteria make a room unsanitary? One hundred? One thousand? One hundred thousand? One million? The answer is, it all depends. A freshly washed kitchen wastebasket may be "sanitary" for purposes of trash storage, but it probably would be extremely unsanitary to eat from. The same could be said of a kitchen floor or a toilet bowl. Whether it is "sanitary" or not depends on the purpose for which it is to be used.

Because the terms "clean" and "sanitary" are impossible to define with any precision, I dissent from the majority's holding that Ms. Reha lacks standing to assert a facial challenge to the ordinance. A law that relies on words which have no fixed meaning, or which mean substantially different things to different people, is

vague on its face, so the reasoning of *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), is inapplicable. The fact that many people could agree that Ms. Reha's home was not "clean and sanitary" is irrelevant. The constitution is designed to avoid the tyranny of the majority that occurs when fundamental rights are put up for a vote.

There are two major reasons why vague laws must be struck down. One is that they deprive citizens of fair notice of what conduct is prohibited; the other is that they encourage discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); and *State v. Newstrom*, 371 N.W.2d 525, 528 (Minn.1985). And we must be especially vigilant about vague laws that can result in incarceration. *Newstrom*, 371 N.W.2d at 525 (citing *Kolender*, 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8). "It has long been settled that 'penal statutes are to be construed strictly.'" *United States v. Campos–Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971) (quoting *Federal Communications Comm'n v. American Broadcasting Co.*, 347 U.S. 284, 296, 74 S.Ct. 593, 600, 98 L.Ed. 699 (1954)). "It is a fundamental tenet of due process that '[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.'" *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939)).

When analyzed under the strict standards that apply to penal legislation, the Minneapolis ordinance clearly fails. The ordinance does not give citizens fair notice of how "clean and sanitary" their homes must be to avoid criminal prosecution. What any given homeowner considers "clean and sanitary" may well be slovenly and squalid in the eyes of the city inspector. That invites arbitrary application of the law because it is left up to the law enforcement agent to decide what "clean and sanitary" means. The inspector's supervisor in this case testified that the defi-

nition of "clean and sanitary" was based on "the standard of the community," but a painstaking review of the ordinance uncovers no reference to "the standard of the community" or any community standards. Totally aside from the fact that constitutional due process rights are not subject to a community vote, the inspector's testimony on this point underlines the extent to which the ordinance is subject to arbitrary interpretation and enforcement. Such a law cannot satisfy the requirements of due process.

The majority's other argument on this issue is that we "can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). As a general proposition, that is correct, but in this case it is clearly wrong. The City of Minneapolis itself has managed to plainly define the prohibited conduct in its ordinances. It simply chose not to use the specific ordinances to prosecute Ms. Reha.

The Minneapolis Code of Ordinances, § 224.960 requires that every home "have a safe unobstructed means of egress." Likewise, section 244.600 makes homeowners responsible for the elimination of insects, rodents, vermin and other pests. Minneapolis, Minn., Code of Ordinances §§ 244.960 and 244.600 (1990).

A jury hearing and seeing the city's evidence at trial could reasonably conclude that Ms. Reha violated both of those provisions. But for reasons unknown, the city chose to prosecute Ms. Reha only under section 244.690, the vague "clean and sanitary" ordinance. For whatever reason, the prosecutor chose to rely on a facially vague ordinance when two perfectly straightforward and clear ordinances were available, each of which gives adequate notice of what is proscribed. The result was that Ms. Reha was deprived of due process of law.

*Rights at stake*

The majority's assertion that the "clean and sanitary" ordinance does not threaten

any constitutionally protected rights is clearly wrong. The ordinance, as applied in this case, tramples upon one of Ms. Reha's most fundamental rights, the right to be left alone, especially in the privacy of her home. *See FCC v. Pacifica Found.*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073 (1978); and *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 77, 103 S.Ct. 2875, 2886, 77 L.Ed.2d 469 (1983) (Rehnquist, J., concurring). *See also Griswold v. Connecticut*, 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965); *Jarvis v. Levine*, 418 N.W.2d 139, 147–49 (Minn.1988); and *State v. Gray*, 413 N.W.2d 107, 111 (Minn.1987).

In this case, there are competing interests: Ms. Reha's right to live in the home environment of her choosing versus the city's power and duty to promote health and safety. It must be conceded that Ms. Reha's privacy rights must at some point give way to the city's interest in general health and welfare. But that point was not reached in this case. The city's interest in health and safety is not implicated by a failure to keep a "clean and sanitary" home because there is no way to know what that phrase means.

The city does have a strong interest in ensuring that homeowners maintain an unblocked path of egress, and probably of ingress, so that residents can escape fire, flood or other disaster and emergency personnel can enter to do their jobs without unnecessary risk to their safety. And the city has a strong interest in preventing vermin infestations and the spread of germs and disease. Both of those interests are reflected in sections 244.600 and 244.-960, mentioned above. And if this case had been brought under those ordinances, the city's important interests in health and safety probably would have outweighed Ms. Reha's right to the lifestyle of her choice. But that is not the case here. The

city can show no legitimate interest in "clean and sanitary" homes without first defining what those terms mean.[1] Because the city has failed to do so in this ordinance, its interest must be subordinated to the important right of Ms. Reha to live the way she chooses.

### Administrative conduct

The majority's other attempt to salvage this flawed ordinance is to argue that city inspectors cured any vagueness problems by informing Ms. Reha of specific ordinances requiring that exits be kept free of clutter and requiring property owners to eradicate insects, rodents, vermin or other pests. The problem with the majority's analysis is that the thing which must be specific is the law,[2] not the instructions from the government agent enforcing the law. What happened here was that Ms. Reha got specific notice of what the inspector thought was required. The inspector issued a notice citing three Minneapolis ordinances which she believed were violated by the condition of the house. But when it came time for trial, Ms. Reha's guilt was judged solely on the vague "clean and sanitary" ordinance.

The unfairness of this can be illustrated by looking at an analogous traffic situation. Under the majority's reasoning, the legislature could enact a statute making "bad driving" an offense. A police officer then could stop a motorist and issue a ticket for "bad driving." When the driver asks for an explanation, the officer could say that the driver went 50 miles per hour in a 35–mile–per–hour zone in violation of Minn.Stat. § 169.14, subd. 2; drove with an obstructed view in violation of Minn.Stat. § 169.37; and failed to yield the right of way in violation of Minn.Stat. § 169.20, subd. 1. But when the case comes to trial, the driver must defend solely against the vague accusation of "bad driving."

1. In its case, the city emphasizes that Ms. Reha's house was filled with "clutter." But by itself, the presence of "clutter" is irrelevant. It only becomes relevant if the so-called "clutter" blocks egress or harbors vermin. In addition, "clutter" may be even more vague than "clean and sanitary," if that is possible.

2. At argument, even the city's counsel conceded that "clean and sanitary" has little independent meaning without reference to the rest of the Minneapolis Code of Ordinances.

In such a case, the only specific notice the driver has of the prohibited conduct is what the officer says. Similarly, the only specific notice Ms. Reha had of the prohibited conduct was what the housing inspector said. But that is not good enough. A criminal defendant is entitled to specific notice of the alleged misconduct. That notice must come from the law and from the judge in court, not from an agent of the prosecutor.

*Kolender* and *Newstrom* stand for the proposition that vague laws are unconstitutional because they encourage arbitrary and discriminatory enforcement. What could be more arbitrary than leaving the definition of the offense to the discretion of the arresting officer? In effect, the majority is saying that any vagueness was cured when the inspector notified Ms. Reha of what the ordinance means. That would be like leaving it to police officers, instead of the courts, to determine whether searches are reasonable under the fourth amendment.

Such an approach flies in the face of almost 200 years of American jurisprudence. It is not for the executive branch to say what the law means. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). In the same opinion, the great Chief Justice Marshall spoke of the American system as "a government of laws, and not of men." *Id.* at 163. Yet, we are ignoring that simple legal principle today by holding that if a law doesn't speak clearly, the words of the man or woman enforcing the law can cure the problem. I cannot join is such a result.

WAHL, Justice (dissenting).

I join in the dissent of Justice Gardebring.