**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-1741**

In the Matter of Minnesota Department of Natural Resources
Special Permit No. 16868 (December 21, 2012) issued to Lynn Rogers

**Filed July 13, 2015**
**Affirmed**
**Rodenberg, Judge**

Minnesota Department of Natural Resources
OAH File No. 84-2001-30915

David R. Marshall, Leah C. Janus, Jessica L. Edwards, Fredrikson & Byron, P.A., Minneapolis, Minnesota (for relator)

Lori Swanson, Attorney General, Jill Schlick Nguyen, Oliver J. Larson, Assistant Attorneys General, St. Paul, Minnesota (for respondent)

Considered and decided by Stauber, Presiding Judge; Bjorkman, Judge; and Rodenberg, Judge.

## S Y L L A B U S

Attaching a radio collar to an habituated North American black bear, with the resulting capacities to remotely track and locate the bear in the wild and to locate the den of the bear, amounts to constructive possession of the wild animal within the meaning of Minn. Stat. §§ 97A.015, subd. 36 and 97A.401, subd. 3(a) (2014).

## O P I N I O N

**RODENBERG**, Judge

Relator challenges the decision of the Minnesota Department of Natural Resources (DNR) declining to renew his permit to take and possess bears, arguing that his conduct

amounts to neither taking nor possessing wild animals within the meaning of Minn. Stat. §§ 97A.015, subd. 36 and 97A.401, subd. 3(a). We affirm.

**FACTS**

Relator Dr. Lynn Rogers is a wildlife biologist who operates the Wildlife Research Institute (WRI) in Eagles Nest Township, located near Ely and within the Superior National Forest. Relator is an expert on the North American black bear (hereinafter, "bear" connotes the North American black bear). Upon learning that the residents of Eagles Nest Township had been feeding bears for years and "experienced very few nuisance bear problems," relator purchased land in Eagles Nest Township to study bears there.

The DNR discovered in 1999 that relator had placed a collar on at least one bear in August of 1998. It notified relator that a permit was required to radio-collar wild animals, explaining that such collaring of wildlife is a form of possession, for which a DNR permit is required. Relator applied for a permit in April 1999 and that permit was granted. Relator maintained various versions of that permit until June 2013. In June 2013, the DNR decided not to renew relator's permit and extended his permit only until the end of July 2013 to give relator enough time to remove the radio collars.

From its inception, relator's research was "built upon intentional activities that cause habituation in bears."[1] Relator habituates bears using food. As a result of

_____

[1] Relator defines habituation as the "waning of a bear's natural response to a neutral stimulus. When a bear is habituated to human contact, the bear's natural response of wariness and avoidance is altered such that the bear appears to ignore the presence of a person." The DNR does not dispute that definition. We use it as an agreed definition.

habituation, he is able to closely observe bears, rest with them, and place radio collars around their necks. The bears are "continually fed" at WRI from feeding troughs and, until 2012, by hand. Relator is able to get close enough to the bears to take their pulse. Relator also pets, pats, strokes, and engages in other physical contact with the bears. Not all bears will interact with relator. He does not force bears to interact with him if they do not do so willingly. Relator's research also includes the use of den cams: cameras placed in a bear den to allow remote viewing of what happens in the den. Relator's den cams have been highly praised in the scientific and educational communities for their contributions to the shared knowledge of bears in dens.

Since 2003, relator has operated a Bear Field Study Course at WRI. For $2,500 each, participants may participate in a four-day program that allows them to locate a collared bear in the wild, observe bears at WRI, listen to lectures presented by relator, visit an unoccupied bear den, look for bear signs in the forest, analyze bear scat, and, until 2012, hand feed uncollared and collared bears, as well as pet, kiss, sit next to, and pose for pictures with bears. Relator and his assistant, Susan Mansfield, "encouraged Bear Field Study Course participants not to post or otherwise publish pictures of bear handling and interaction taken during course activities, advising participants that the activities would not reflect well on the WRI."

The DNR's public safety concerns regarding WRI increased in 2012. A collared bear, her yearling, and another uncollared bear were reported in a homeowner's yard. When the homeowner attempted to chase the bears away, the bears did not leave. A cabin owner reported that, while watching television, he noticed a collared bear pressed

3

against his window, "two feet from his head." A conservation officer reported that a collared bear (accompanied by two other bears) "walked within four feet of the officer, stood up on her hind legs and put her left paw on [the officer's] gun belt." The DNR received another report that a collared bear and her two cubs were circling vehicles in a nearby state park. In another report, a dog was injured after the dog's owner was unable to scare away a bear. On another occasion, an officer needed to shoot a collared bear after the bear approached a woman and her two small children. The woman had been unable to scare away the bear, even after hitting the bear with a broom. When the officer arrived, the bear approached the officer and "made contact with the officer's hand with its teeth." The officer destroyed the bear "[b]ecause it did not appear to be afraid of humans and [would] not leave the area."

The DNR's experts cited relator for the nuisance bear problems and recommended the DNR not renew relator's permit. In 2013, the DNR received information that relator had taught over 650 Bear Field Study Course participants how to feed bears by hand. The DNR also received two videos: one showing members of the public finding and disturbing a bear's den where relator had placed a den cam, and the other showing relator punching a bear in the face. The DNR ultimately decided not to renew relator's permit.

Relator sued the DNR and the Commissioner in the district court for Ramsey County, seeking review of the DNR's decision not to renew relator's permit. Relator moved the district court for a temporary restraining order requiring reinstatement of the permit. The parties stipulated to the commencement of a contested-case proceeding and the district court stayed the proceedings before it, but retained jurisdiction until the

4

completion of the contested-case proceeding. The district court ordered that, until the completion of the contested case proceeding, relator could continue to collar the bears already collared but could collar no others, he could install den cams pursuant to the December 21, 2012 permit, but could neither live-stream the den cam footage nor engage in bear-habituation activities other than activities necessary to change the batteries on the radio-collars.

In the contested case proceeding, relator moved for summary disposition in January 2014, arguing that his activities amounted to neither possession nor taking of bears. The Administrative Law Judge (ALJ) concluded, as a matter of law, that relator's conduct could not be considered a "taking" under Minn. Stat. § 97A.401, subd. 3(a), and summarily granted relator's pre-hearing motion disposing of this issue. But the ALJ denied relator's motion concerning whether relator's conduct amounted to possession, concluding that issues of material fact remained for resolution. An evidentiary hearing was held over the course of nine days. In May 2014, the ALJ recommended that the commissioner deny relator's permit, based on a determination that relator's activities amounted to possession of bears within the meaning of Minn. Stat. § 97A.401, subd. 3(a). In September 2014, the commissioner adopted the ALJ's recommendation to deny relator's permit, concluding that relator's conduct amounted to both taking and possession of bears. This certiorari appeal followed.

## ISSUE

Does attaching a radio collar to an habituated black bear, with the resulting capacities to remotely track and locate the bear in the wild and to locate the den of the

5

bear, amount to constructive possession of a wild animal within the meaning of Minn. Stat. §§ 97A.401, subd. 3(a) and 97A.015, subd. 36?

## ANALYSIS

Minnesota's game and fish laws, enacted for the purpose of preserving wild animals for the enjoyment and use of future generations, have been codified since 1891:

> The preservation of [wild] animals as are adapted to consumption as food, or to any other useful purpose, is a matter of public interest; and it is within the police power of the state, as the representative of the people in their united sovereignty, to enact such laws as will best preserve such game, and secure its beneficial use in the future to the citizens.

*State v. Rodman*, 58 Minn. 393, 400, 59 N.W. 1098, 1099 (1894). "[O]wnership of wild animals rests in the state for the benefit of all its people in common." *Waldo v. Gould*, 165 Minn. 128, 130, 206 N.W. 46, 47 (1925); *see also* Minn. Stat. § 97A.025 (2014) ("A person may not acquire a property right in wild animals . . . unless authorized under the game and fish laws.").

On certiorari review, we consider whether an agency's decision violates a constitutional provision, exceeds the agency's statutory authority, is arbitrary or capricious, is unsupported by substantial evidence, is made upon an unlawful procedure, or is affected by other error of law. Minn. Stat. § 14.69 (2014). We may, among other things, affirm or reverse the decision of the commissioner or remand the case for further proceedings. *Id.*

## I.

This case concerns the proper interpretation of the words "take" and "possess" in Minn. Stat. § 97A.401, subd. 3(a). The statute provides:

> [S]pecial permits may be issued without a fee to *take*, *possess*, and transport wild animals as pets and for scientific, educational, rehabilitative, wildlife disease prevention and control, and exhibition purposes. The commissioner shall prescribe the conditions for taking, possessing, transporting, and disposing of the wild animals.

Minn. Stat. § 97A.401, subd. 3(a) (emphasis added).

While interpretation of a statute is a question of law reviewed de novo, we give deference to an administrative agency's interpretation of the challenged statute in two situations. *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance*, 731 N.W.2d 502, 516 (Minn. 2007) (hereinafter "*Annandale*"). First, we give deference to an administrative agency's interpretation when "the agency is legally required to enforce and administer the [statute] under review." *Id.* Second, we give deference to an administrative agency's interpretation when "the meaning of the words in the [statute is] . . . unclear and susceptible to different reasonable interpretations—ambiguous." *Id.* If we decide that a statute is "unclear and susceptible to different reasonable interpretations," we must decide if the agency's interpretation of that statute is reasonable. *Id.* If the agency's interpretation is reasonable, we will defer to the agency's interpretation. *Id.*

The ALJ concluded here that relator's actions amounted to possession, but not taking. The commissioner concluded that relator's actions constituted both taking and possession under Minn. Stat. § 97A.401, subd. 3(a).

Concerning whether relator's actions constitute possession, the parties agree that hand-feeding of bears is legal in Minnesota. It requires no permit.

The commissioner's September 2014 denial of relator's permit application concluded that both radio-collaring and intentional and repeated handling of bears may constitute possession. During oral argument before us, the DNR abandoned its position that intentional and repeated handling might amount to possession. We therefore address only whether radio-collaring, as has been performed by relator, constitutes possession under Minn. Stat. § 97A.401, subd. 3(a).

Minnesota's game and fish laws define "possession" to include "both actual and constructive possession and control of the things referred to." Minn. Stat. § 97A.015, subd. 36 (2014). The game and fish laws do not define the terms "actual," "constructive," or "control."

The commissioner concluded that, "no matter how temporary" the possession of a bear might be, a permit is required when such possession "results with a bear having a collar on it so it can be tracked and found again." In support of this proposition on appeal, the commissioner reasons that

> [p]ossession occurs when a collar is placed on a bear even
> though that activity takes place in a short amount of time and
> the bears remain in the wild . . . [because] the collars provide
> continued access to the bears that the general public does not

8

have and the bears are unable to avoid the continued human intervention.

The commissioner argues that relator exercised actual possession of the bears when he affixed radio collars around their necks. Further, the commissioner argues that a radio collar allows relator to exercise sufficient control over the bears to amount to constructive possession, and that the radio collars are an insignia of possession.

Relator argues that possession requires "confinement, capture, or removal from nature," citing to several out-of-state authorities. He vigorously maintains that, despite being habituated and therefore comfortable with relator's touching and collaring of them, the bears are not captured nor are they forced to have physical contact with relator or other humans. They remain in the wild.

No reported Minnesota case addresses the definition of possession under Minn. Stat. § 97A.015, subd. 36. Therefore, we address whether radio-collaring an animal constitutes possession under Minn. Stat. § 97A.401, subd. 3(a), as an issue of first impression.

"Possession" in the law has no single, clear definition. *See Baehr v. Penn-O-Tex Oil Corp.*, 258 Minn. 533, 536, 104 N.W.2d 661, 664 (1960) (stating that "[p]ossession is a chameleon-like term which takes its meaning from its context both in common speech and in legal terminology" (quotation omitted)); *Jacobson v. Aetna Cas. & Sur. Co.*, 233 Minn. 383, 386, 46 N.W.2d 868, 870 (1951) ("The word possession has many shades of meaning and, as applied to a variety of facts, is not capable of one exact definition." (emphasis omitted)); *see also Nat'l Safe Deposit Co. v. Stead*, 232 U.S. 58, 67, 34 S. Ct.

9

209, 212 (1914) ("[T]here is no word more ambiguous in its meaning than possession. It is interchangeably used to describe actual possession and constructive possession which often so shade into one another that it is difficult to say where one ends and the other begins.").

"Actual possession" means physical control of the thing possessed. *See State v. Florine*, 303 Minn. 103, 104, 226 N.W.2d 609, 610 (1975); *see also State v. Simion*, 745 N.W.2d 830, 842 (Minn. 2008) (defining "actual possession" as "direct physical control"); *Baehr*, 258 Minn. at 537, 104 N.W.2d at 664 (defining "actual possession" in the context of land disputes as "'actual occupan[c]y,' which means physical presence upon and control of premises"). Actual possession does not require the possessor to have a property interest or ownership interest in the item possessed. *See State v. Johnson*, 551 N.W.2d 244, 246 (Minn. App. 1996) (rejecting argument that ownership is sufficient to prove possession), *review denied* (Minn. Sept. 20, 1996); *see also Ehle v. Prosser*, 293 Minn. 183, 189-90, 197 N.W.2d 458, 462 (Minn. 1972) (requiring that the possessor of land in an adverse possession action not also be the owner of the possessed land and, instead, have an intent to "oust the owner").

"[C]onstructive possession exists wholly in contemplation of law without possession in fact." *Jacobson*, 233 Minn. at 388, 46 N.W.2d at 871; *see also Simion*, 745 N.W.2d at 842 (explaining that constructive possession "exists where an owner intentionally gives actual possession . . . of the property to another in order for that person to do some act for the owner to or with the property"); *Baehr*, 258 Minn. at 537,

104 N.W.2d at 664 (defining constructive possession as "the legal right to possession which follows from title without actual possession").

A brief history of the origin of the legal concept of constructive possession helps to illuminate the amorphous nature of the concept. Constructive possession was originally used in the master-servant context, where, in order for a master to prove larceny by a servant, there must have first been a trespass. *Jacobson*, 233 Minn. at 387-88, 46 N.W.2d at 871. A trespass at common law amounted to taking from the possession of another without the other's consent. *Id.* at 387, 46 N.W.2d at 871. However, when a master placed an item into a servant's care, the servant gained possession with consent and, therefore, without trespassing. *Id.* A servant who had originally taken actual possession with the master's consent and then permanently deprived the master of the item could not be found to have committed larceny because there had been no trespass. *Id.* In order to "prevent[] injustice," "[t]he courts resorted to the fiction of constructive possession to expand the definition of possession." *Id.* at 387-88, 46 N.W.2d at 871 (emphasis omitted). The master who gave property to a servant was said to have retained constructive possession of it even after surrendering actual possession. *See generally id.*

The concept of constructive possession in the modern context of possession of contraband has taken a curious turn. Whereas the concept was originally developed in the law of larceny to criminalize actual possession without legal title, the law now criminalizes constructive possession based on circumstantial evidence of past likely possession of contraband without present actual possession. *See Florine*, 303 Minn. at

11

104-05, 226 N.W.2d at 610. In contraband-possession cases, law enforcement often does not find the defendant actually possessing contraband. *See State v. Salyers*, 858 N.W.2d 156, 157-58 (Minn. 2015) (affirming defendant's conviction of possession of a firearm after a search resulted in law enforcement finding a shotgun in a locked gun safe in defendant's bedroom); *Florine*, 303 Minn. at 103-04, 226 N.W.2d at 610 (affirming the conviction of a defendant of possession of controlled substances after cocaine and marijuana were found in an unlocked *abandoned* vehicle). In order to prosecute the crime of possession without proof of the defendant having actual possession, modern criminal law has come to rely on the legal fiction of constructive possession. *See Salyers*, 858 N.W.2d at 159; *Florine*, 303 Minn. at 105, 226 N.W.2d at 611; *State v. Dickey*, 827 N.W.2d 792, 796-97 (Minn. App. 2013).

In the contraband-possession context, constructive possession serves to

> include within the possession statute those cases where the state cannot prove actual or physical possession at the time of arrest but where the inference is strong that the defendant at one time physically possessed the substance and did not abandon his possessory interest in the [illicit item] but rather continued to exercise dominion and control over it up to the time of the arrest.

*Florine*, 303 Minn. at 104-05, 226 N.W.2d at 610. In order for the state to prove that a person possessed an item in violation of law, there must be evidence (1) "that the police found the [illicit item] in a place under defendant's exclusive control to which other people did not normally have access," or (2) "that, if police found it in a place to which others had access, there is a strong probability (inferable from other evidence) that

12

defendant was at the time consciously exercising dominion and control over it." *Id.* at 105, 226 N.W.2d at 611.

"Possession" is "susceptible to different reasonable interpretations" as used in Minn. Stat. § 97A.401, subd. 3(a), and is therefore ambiguous. *See Annandale*, 731 N.W.2d at 516. The meanings of "actual possession" and "constructive possession" being dependent on the legal context in which they are used, we interpret the terms here in light of the DNR's obligation to administer and enforce the game and fish laws. Minn. Stat. §§ 97A.015, subd. 10, .201, subd. 1, .401, subd. 1 (2014). Deference to the agency in this case is appropriate if the commissioner's interpretation of the statute is reasonable. *See Annandale*, 731 N.W.2d at 516.

Relator argues that there is no evidence in the record tending to show how relator places radio collars on bears:

> The DNR did not present <u>any</u> evidence regarding how Dr. Rogers places radio collars on bears or interacts with bears to maintain those collars. In fact, the DNR did not present <u>any</u> witness that had personally observed Dr. Rogers or Mansfield collar a bear.

Relator also argues that the ALJ "did not find that the act of placing a collar on a bear constitutes possession."

Relator's contentions are not supported by the record. The commissioner adopted the ALJ's conclusion that "[a]ffixing a tracking collar to a bear for the purpose of locating the bear in the wild, in whatever manner the collar is attached, meets the definition of 'possession' as the term is used in Minn. Stat § 97A.401, subd. 3(a)."

13

The record also contains Mansfield's testimony that collars are placed on bears by "slipping the collar around their neck and there's two bolts that have to go through the collar, a metal plate that goes on the bolts and then nuts on the bolts and you tighten the nuts." While relator maintains that the bear's movement is not restricted when the collar is affixed to the bear and that the bears are free to walk away during the process of collaring, Mansfield also testified that, in order to collar a bear, Mansfield or relator will hand-feed the bear, availing themselves of its habituation to keep it in one place. The record therefore does contain evidence of "how Dr. Rogers places radio collars on bears." Indeed, the record before us is thorough, the parties having carefully and extensively demonstrated both what Dr. Rogers does, and the effects of his actions on bears.

The commissioner reasons that collaring bears constitutes possession because the collars "provide continued access to the bears that the general public does not have and the bears are unable to avoid the continued human intervention." This conclusion parallels the ALJ's reasoning that

> [b]y putting a collar on a bear and using that collar to track its location, [relator] exercises an intentional power to alter the bear's natural freedom in at least one critical respect: the bear is no longer free to avoid humans. It loses its natural ability to be left alone. . . . [Relator] has control of whether, and to what extent, humans intrude upon the bear's natural world on a regular basis.

Relator responds that, "even if a bear has a working collar, it is free to avoid humans." (Internal quotation marks omitted.) He further argues that the ALJ's analysis, adopted by the commissioner, "is dependent upon [relator] having the intent to actually

14

locate the bear in the wild," and that to interpret "possession" in this manner would lead to an absurd result.

Relator's argument that the conclusions reached by the ALJ and the commissioner would lead to an absurd result supposes that affixing a tracking collar on a bear *is not* possession, but tracking a bear's location *is* possession. But neither the ALJ nor the commissioner concluded that tracking a bear's movements alone could constitute possession. The DNR instead reasons that the bears are possessed by relator because "the bears are unable to avoid the continued human intervention," and argues that this inability of the bears to avoid contact with humans supports the ultimate conclusion that affixing a tracking collar to an animal amounts to possession.

While there is evidence in the record to support relator's assertion that the DNR at one time questioned whether radio-collaring a bear amounted to "possession" under Minn. Stat. § 97A.401, subd. 3(a) (1998) (using the same language as the version at issue here),[2] we are persuaded that feeding a bear and habituating it in order to keep it in one

---

[2] In 1999, an employee of the DNR received information that relator sought to enter the private property of a landowner in order to observe a bear den. The employee surmised that the only way relator would have known where the den was located was if he had radio-collared the bear. The employee sought clarification from an assistant director of enforcement for the DNR about whether relator could be cited for collaring bears, or otherwise prevented from collaring bears, in light of relator's "claims he slipped a collar on the bear while he fed it." The assistant director reasoned that "[i]f [relator] has tagged or collared a bear he had to have the animal in his possession if only for a short period of time to affix the collar or tag," but ultimately concluded that he "wouldn't write anybody a ticket for slipping a collar or tag over a bear's head. . . . [T]he analysis is thin until we get to a place where a cub is taken or a blood sample is taken." This uncertainty arose in 1999 and the DNR has consistently maintained since then, for 15 years, that radio-collaring a wild animal requires a permit. And relator has consistently applied for and

15

place while a radio collar is affixed to it is a significant form of exerting control over the animal. Because the definition of "possession" in the game and fish laws includes "constructive possession," Minn. Stat. § 97A.015, subd. 36, a term in the law with a meaning highly dependent on the legal context in which it is used, we are persuaded by the DNR's reasoning. In the context of wild animals, the "quality of possession required to satisfy" Minn. Stat. § 97A.401, subd. 3(a), is satisfied by affixing a radio collar to a bear. *See State v. Bagley*, 286 Minn. 180, 187, 175 N.W.2d 448, 453 (Minn. 1970) (holding that the "quality of possession required to satisfy the theft or larceny statute is personal and exclusive possession" but that "'personal' possession does not require that the property be actually in [the] defendant's hands or on his person"). The commissioner reasonably concluded that the amount of control necessarily exercised over a bear in order to collar it is sufficient to meet the definition of possession. Because the commissioner's interpretation of possession is reasonable, we defer to it. *See Annandale*, 731 N.W.2d at 516.

We hold that the act of attaching a radio collar to a bear with the attendant capacities to track and locate the bear in the wild and to locate the bear's den amounts to constructive possession of the bear under Minn. Stat. §§ 97A.015, subd. 36 and 97A.401, subd. 3(a).

---

acted pursuant to those permits, all of which were issued on the premise that relator's actions amounted to possession.

Because we hold that relator's actions concerning bears amount to possession within the meaning of Minn. Stat. § 97A.401, subd. 3(a), and therefore require a permit under the statute, we do not address whether relator's actions are also a taking.[3]

## II.

Relator challenges the commissioner's interpretation of Minn. Stat. § 97A.401, subd. 3(a), arguing that interpreting the statute to encompass relator's conduct would render the statute unconstitutionally vague. He urges us to apply the rule of lenity and argues that, under the commissioner's interpretation of Minn. Stat. § 97A.401, subd. 3(a), "the public will not have fair notice of when legal feeding, touching, interaction, and habituation of bears becomes illegal." He further argues that the commissioner's interpretation "could lead to subjective and arbitrary enforcement."

But relator does not argue in his principal brief that *he* did not have fair notice or that *he* was subject to subjective or arbitrary enforcement. In his reply brief, relator argues that "the statute is unconstitutionally vague as applied to his conduct" and that he "demonstrated that the statute, as the DNR has applied it to [his] conduct, engenders arbitrary and discriminatory enforcement."

"Constitutional challenges are questions of law, which we review de novo. In conducting this review, we recognize that Minnesota statutes are presumed constitutional,

---

[3] We observe that none of the parties here had the benefit of the Minnesota Supreme Court's decision in *State v. Schmid*, 859 N.W.2d 816 (Minn. 2015), when briefing whether relator's actions could fall under the definition of "taking" in Minn. Stat. § 97A.401, subd. 3(a). The Minnesota Supreme Court in *Schmid* affirmed the holding of this court's decision and narrowly defined "taking" by "pursuit" to mean "to follow in an effort to overtake or capture." *Schmid*, 859 N.W.2d at 824 (citing *The American Heritage Dictionary* 1431 (5th ed. 2011)).

and our power to declare a statute unconstitutional is exercised with extreme caution and only when absolutely necessary." *State v. Campbell*, 756 N.W.2d 263, 268 (Minn. App. 2008) (quotation and citation omitted), *review denied* (Minn. Dec. 23, 2008). "The void-for-vagueness doctrine requires that a legislative enactment define a criminal offense with sufficient definiteness and certainty that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 269 (quotation omitted). "We do not expect mathematical certainty from the English language, and a statute that is flexible and reasonably broad will be upheld if it is clear what the statute, as a whole, prohibits." *Id.*

"The void-for-vagueness doctrine does not allow one who has received fair warning of the criminality of his own conduct from the statute in question to attack it because the language would not give similar fair warning with respect to other conduct which might be within its broad and literal ambit." *State, City of Minneapolis v. Reha*, 483 N.W.2d 688, 691 (Minn. 1992) (quotation omitted). However, a party may bring a void-for-vagueness challenge if the statute at issue encompasses constitutionally protected conduct or if there is a potential for arbitrary and discriminatory enforcement. *Id.* at 691-92. *But see Campbell*, 756 N.W.2d at 275 (refusing to void a statute for vagueness when "the danger of arbitrary enforcement is speculative and insufficient to render the statute unconstitutionally vague as applied").

Relator was first warned by the DNR in 1999 that radio-collaring bears requires a permit because the DNR considered such collaring to be "possession" under Minn. Stat. § 97A.401, subd. 3(a). From that time forward, relator was granted permits on the

18

premise that such collaring amounted to possession. The permits allowed radio-collaring of bears. On this record, relator cannot credibly argue that he was not on notice that radio-collaring bears constituted possession and required a permit.

We also observe that relator's acquiescence to the DNR's interpretation of possession is important in assessing his void-for-vagueness arguments. One would ordinarily not seek a permit for conduct that one does not believe requires a permit, and would instead challenge government action premised on the need for a permit. Here, relator seems to have understood and tacitly agreed, for 15 years, that radio-collaring bears is possession under the law.

On appeal, neither party argues that Minn. Stat. § 97A.401, subd. 3(a), concerns a constitutionally protected right. And a prohibition on radio-collaring a wild animal without a permit is a very specific proscription, unlikely to lead to arbitrary or capricious enforcement. Relator has failed to provide us with sufficient reason to reach the void-for-vagueness analysis here. *See Reha*, 483 N.W.2d at 691; *Campbell*, 756 N.W.2d at 275.

The rule of lenity requires that courts interpret statutes with potential criminal consequences in favor of the more lenient interpretation when, even after applying the canons of construction, the statute remains ambiguous. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) (stating that, although the rule of lenity is ordinarily applied in the criminal context, it may be applied in the civil context when violation of the challenged statute could result in a criminal sanction). We have here applied traditional methods of statutory interpretation to conclude that possession has the meaning ascribed to it by the commissioner. And that is the meaning

19

of possession on which the parties to this appeal have acted over the course of more than a decade under various incarnations of a permit issued to relator. The statute here is not sufficiently ambiguous to warrant the application of the rule of lenity. *See id.*

## III.

Relator also argues that, even if he is denied the right to radio-collar bears, the record fails to support a finding that the DNR had good cause to deny relator a permit to use den cams. The commissioner argues that relator focuses on the wrong issue, and that the issue in this case is whether the DNR had cause to deny relator the existing permit in its entirety. The commissioner argues that the agency is not required to ascertain whether some of the activities allowed under the earlier permit(s) might be insufficient to constitute possession. The commissioner argues that, because there was cause to deny relator a permit, the entire permit may be denied.

The game and fish laws provide:

> Wherever the game and fish laws specifically provide for the issuance of a permit by the commissioner, the commissioner may do the following in accordance with criteria and procedures established in rules adopted by the commissioner: (2) deny, modify, suspend, or revoke a permit for cause.

Minn. Stat. § 97A.418 (2014).

The commissioner did not revoke relator's permit because of relator's den cams. The record contains no conclusion, nor even a suggestion, that a den cam amounts to possession under the law. As such, relator needs no permit for placement of such

20

cameras.[4] Relator provides no authority for the notion that the DNR must comb through permits and determine whether there is good cause to deny, modify, suspend, or revoke the permit as to each permitted activity. A plain reading of the statute does not require this. Relator's permits were issued for radio-collaring of bears and activities ancillary to such collaring. Because such collaring is possession, the DNR declined to renew the permit for the reasons noted. The commissioner did not err in declining to renew relator's permit, even though some of the activities identified by the permit do not amount to possession.

## DECISION

A permit is required to possess a bear under Minn. Stat. § 97A.401, subd. 3(a) of the Minnesota game and fish laws. The meaning of "possession" in Minn. Stat. §§ 97A.401, subd. 3(a) and 97A.015, subd. 36, is ambiguous. The DNR, tasked with the enforcement of the game and fish laws, has reasonably interpreted "possession" under Minn. Stat. §§ 97A.401, subd. 3(a) and 97A.015, subd. 36, to include relator's radio-collaring activities. We therefore defer to the commissioner's reasonable interpretation of "possession" and hold that the act of attaching a radio collar to an habituated black bear with the resulting capacities to remotely track and locate the bear in the wild and to locate the den of the bear, amounts to constructive possession of the wild animal within the meaning of Minn. Stat. §§ 97A.401, subd 3(a) and 97A.015, subd. 36.

**Affirmed.**

---

[4] We note that the use of trail cameras and the like is commonplace; they are used by hunters and wildlife enthusiasts. No argument is made in this appeal that automated photography of wildlife requires a permit.

21