*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-2049, A16-0024, A16-0025**

Guardian Interlock Systems,
Relator,

vs.

Minnesota Department of Public Safety, et al.,
Respondents.

**Filed August 15, 2016
Affirmed in part and vacated in part
Rodenberg, Judge**

Ramsey County District Court
File Nos. 62-CV-15-6742, 62-CV-15-6437

Minnesota Department of Public Safety

Jack Y. Perry, Jason R. Asmus, Briggs and Morgan, P.A., Minneapolis, Minnesota (for relator)

Lori Swanson, Attorney General, Jeffrey S. Bilcik, Assistant Attorney General, St. Paul, Minnesota (for respondents Minnesota Department of Public Safety, Ramona Dohman, Driver and Vehicle Services, and Patricia McCormack)

Considered and decided by Bjorkman, Presiding Judge; Peterson, Judge; and Rodenberg, Judge.

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

In these consolidated appeals, Guardian Interlock Systems (Guardian) challenges respondent Minnesota Department of Public Safety, Driver and Vehicle Services (DVS)

Division's decertification of Guardian as a provider of ignition-interlock devices to Minnesota drivers, and challenges the district court's denial of its motion for temporary injunctive relief and its petition for a writ of mandamus. Because certiorari is the exclusive mechanism for review of an agency's quasi-judicial decision, the district court lacked subject-matter jurisdiction. We therefore vacate the district court's orders denying temporary injunctive relief and mandamus for want of subject-matter jurisdiction. Because DVS's decertification decision was neither arbitrary nor capricious, we affirm the agency action.

**FACTS**

This appeal concerns the Ignition Interlock Device (IID) program established by Minn. Stat. § 171.306 (2014). An IID is "equipment that is designed to measure breath alcohol concentration and to prevent a motor vehicle's ignition from being started by a person whose breath alcohol concentration measures 0.02 or higher on the equipment." *Id.*, subd. 1(b). Such devices are used as a condition of probation and/or a condition of the driving privileges of convicted drunk drivers, to ensure that a driver has no alcohol present in his or her system before the vehicle will start. *See generally id.* By statute, the Minnesota Commissioner of Public Safety must "establish performance standards and a process for certifying devices used in the ignition interlock program." *Id.*, subd. 2. "The manufacturer of the device must apply annually for certification of the device by submitting the form prescribed by the commissioner." *Id.* The establishment of performance standards and the certification process are exempt from the requirements of the Minnesota Administrative Procedures Act. *Id.*, subd. 8.

2

The commissioner has established performance standards for IIDs. *See generally* Minn. Dep't of Pub. Safety, *2015 Certification Process for the Minnesota Ignition Interlock Device Program* (2015). Among other requirements, the performance standards require that IIDs be equipped with cameras that "[m]ust take a photo for every event including initial starts, all rolling retests, and whenever a violation is recorded."[1] *Id.* at 5. The obvious reason for this requirement is to generate evidence of who provided each breath sample. DVS also requires certified manufacturers to generate and submit to DVS a daily data file, which "must include all devices installed, all devices removed, and all violations reported." *Id.* at 13. Certified manufacturers must also maintain a website with all participant data and photos available to DVS. *Id.* at 19. DVS may deny certification, decertify, suspend, revoke, or conditionally certify a manufacturer for the following:

> 1. Evidence of repeated device failures due to defects in design, materials, or workmanship during manufacturing.
> . . .
> 3. Any finding that the manufacturer is not in compliance with the provisions of these performance standards, regulations, or other applicable law.

*Id.* at 20. "Manufacturers may appeal their decertification, suspension, revocation, or conditional certification within seven (7) business days of receiving notification." *Id.* at 20.

---

[1] The parties refer to the images captured by the IID as "photos" or "photographs." "Photograph" connotes an image created by exposure of a photosensitive surface to light. *The American Heritage Dictionary of the English Language* 1329 (5th ed. 2011). The images involved here are not, strictly speaking, photographs. Relying on the record, we refer to the images captured by an IID as "photos," despite no true "photography" being involved in the capture of images.

Guardian, a manufacturer, was certified to provide IIDs to program participants from April 29, 2011 until DVS decertified it by letter dated October 15, 2015. The primary concern of DVS about Guardian's IIDs was the absence of photos from a number of tests done on Guardian's devices. As early as 2013, DVS notified Guardian that photos were missing for some IID participants using Guardian's devices. On June 3, 2015, following multiple exchanges of communication with Guardian on this issue, and with Guardian's certification set to expire on June 30, 2015, DVS conditionally certified Guardian through July 31, 2015. The conditional-certification letter stated that "DVS will continue to monitor Guardian's problem with downloading photos" and that "DVS expects that the percentage of data missing photos will drop significantly to below 10 percent by July 15, 2015." DVS expressed concern that "[b]etween March 23, 2015 and May 25, 2015, an average of 38 percent of the data Guardian sent in its daily data file was missing photos."

On July 17, 2015, and because of continuing problems with "missing photos," DVS suspended Guardian "from performing new installs for 90 days" and stated the agency expectation that "the percentage of data missing photos will drop to below 10 percent by October 15, 2015." On October 15, 2015, DVS decertified Guardian because of continued photo problems and Guardian's installation of two devices during the period of its suspension. Guardian appealed, and DVS denied the appeal by order dated October 29, 2015. Guardian appealed (A15-2049) the agency decision to this court by writ of certiorari.

Guardian also petitioned the district court for a writ of mandamus. *See Guardian Interlock Sys. v. Minn. Dep't of Pub. Safety*, No. 62-CV-15-6437. The district court denied the petition for mandamus, reasoning that Guardian had not established the failure of DVS to perform a duty clearly required by law. Guardian appealed (A16-0025) the district court's order denying mandamus relief.

Guardian also sued DVS in a declaratory-judgment action in district court. In that action, Guardian moved the district court for temporary injunctive relief. *See Guardian Interlock Sys. v. Minn. Dep't of Pub. Safety*, No. 62-CV-15-6742. The district court denied the temporary-injunction motion, reasoning that the balance of harms slightly favored DVS, that Guardian had not demonstrated a high likelihood of success on the merits, and that public-policy considerations weighed strongly against granting injunctive relief. Guardian appealed (A16-0024) the district court's denial of injunctive relief.

On January 21, 2016, we consolidated the three appeals. Both parties then moved this court to supplement the administrative record. Guardian sought to supplement the record with data from its program-required website. DVS sought to supplement the record with two affidavits. By order dated June 8, 2016, we granted both parties' motions.

## D E C I S I O N

Guardian challenges DVS's decertification decision by certiorari petition, and appeals the district court's separate denials of mandamus and temporary injunctive relief. We first consider the district court's subject-matter jurisdiction to review the agency's decision to decertify.

5

## I.    District Court Orders

When we consolidated the three appeals, we ordered the parties to brief the issue of the district court's subject-matter jurisdiction, and particularly whether certiorari is the exclusive method of review.

Subject-matter jurisdiction is a question of law, which we review de novo. *Nelson v. Schlener*, 859 N.W.2d 288, 291 (Minn. 2015). "[U]nless otherwise provided by statute, a petition for a writ of certiorari is the exclusive procedure for reviewing an administrative agency's quasi-judicial decision." *Lam v. City of St. Paul*, 714 N.W.2d 740, 743 (Minn. App. 2006). This exclusivity derives from separation-of-powers considerations and "is required to provide appropriate deference and to minimize the judicial intrusion into administrative decision-making." *Tischer v. Hous. & Redevelopment Auth. of Cambridge*, 693 N.W.2d 426, 429 (Minn. 2005). Quasi-judicial decision-making involves: "(1) investigation into a disputed claim and weighing of evidentiary facts; (2) application of those facts to a prescribed standard; and (3) a binding decision regarding the disputed claim." *Minn. Ctr. for Envtl. Advocacy v. Metro. Council*, 587 N.W.2d 838, 842 (Minn. 1999).

Here, Guardian's challenges to the DVS decertification order meet all three criteria. First, in decertifying Guardian, DVS considered evidentiary facts including the daily data files that Guardian submitted and evidence that Guardian installed two devices after the July 17, 2015 suspension letter prohibiting it from doing so. Second, DVS applied those facts to the IID program certification standards and the standards set forth in its conditional-certification and suspension letters to Guardian. Third, DVS's decision

6

was binding because DVS is responsible for the IID program and certifying manufacturers of IID devices. *See* Minn. Stat. § 171.306, subd. 2. Once DVS decertified Guardian, the company was no longer eligible to install devices and was required to remove any Guardian devices from program participants' vehicles. *Id.* DVS's decision was therefore a quasi-judicial decision, subject to review only by writ of certiorari to this court.

Guardian argues that the district court had subject-matter jurisdiction concerning its declaratory-judgment action and its petition for writ of mandamus because Guardian challenged the constitutionality of DVS's enforcement of the IID program requirements. Guardian cites cases concerning constitutional challenges to the implied-consent law in support of its position, which are distinguishable from this case. *See Nordvick v. Comm'r of Pub. Safety*, 610 N.W.2d 659, 662 (Minn. App. 2000) (involving a challenge to the constitutionality of the implied-consent laws); *Ruzic v. Comm'r of Pub. Safety*, 455 N.W.2d 89, 90-91 (Minn. App. 1990) (involving a void-for-vagueness challenge to the implied-consent laws). First, the cases that Guardian cites concern direct challenges to the constitutionality of the implied-consent laws. Here, Guardian challenges DVS's actual enforcement of the IID program requirements, but Guardian does not challenge the constitutionality of Minn. Stat. § 171.306 or DVS's authority to enact the IID program requirements. Second, cases concerning the implied-consent laws are distinguishable from this case because Minn. Stat. § 169A.53, subd. 2(a) (2014) expressly provides for district-court review of agency action under Minnesota's implied-consent laws. There is no statute providing for judicial review of decisions under Minn. Stat. § 171.306 by any

7

method other than by writ of certiorari. Moreover, constitutional challenges can be made in certiorari appeals. *See, e.g.*, *In re Minn. Dep't of Nat. Res. Special Permit No. 16868*, 867 N.W.2d 522, 532-23 (Minn. App. 2015) (considering the void-for-vagueness doctrine on certiorari review), *review denied* (Minn. Oct. 20, 2015).

Because writ of certiorari is the exclusive method of reviewing DVS's quasi-judicial decertification decision, the district court lacked subject-matter jurisdiction to review the agency's decision to decertify. And we are likewise without subject-matter jurisdiction to review the agency decision other than by certiorari. *See Tipka v. Lincoln Int'l Charter Sch.*, 864 N.W.2d 371, 373 (Minn. App. 2015) ("The writ of certiorari is a means of judicial review of an administrative body's quasi-judicial decision when there is no other legal remedy or adequate means of review."). We therefore vacate the district court's orders denying mandamus and temporary injunctive relief as having been issued without subject-matter jurisdiction.

## II.    DVS's Decertification Decision

Guardian argues in its certiorari appeal that DVS acted arbitrarily and capriciously in decertifying Guardian. "An agency's quasi-judicial determinations will be upheld unless they are unconstitutional, outside the agency's jurisdiction, procedurally defective, based on an erroneous legal theory, unsupported by substantial evidence, or arbitrary and capricious." *Cole v. Metro. Council HRA*, 686 N.W.2d 334, 336 (Minn. App. 2004) (quotation omitted). "An agency's conclusions are not arbitrary and capricious so long as there is a rational connection between the facts found and the choice made." *In re*

8

*Review of 2005 Annual Automatic Adjustment of Charges*, 768 N.W.2d 112, 120 (Minn. 2009) (quotation and citations omitted).

> The substantial evidence test requires a reviewing court to evaluate the evidence relied upon by the agency in view of the entire record as submitted. If an administrative agency engages in reasoned decisionmaking, the court will affirm, even though it may have reached a different conclusion had it been the factfinder.

*Cable Commc'ns Bd. v. Nor-west Cable Commc'ns P'ship*, 356 N.W.2d 658, 668-69 (Minn. 1984) (quotations and citations omitted).

DVS denied Guardian's appeal and decertified Guardian on October 29, 2015, concluding that "the [October 15, 2015] decertification letter contains specific reasons for the denial, including recorded instances of Guardian violating its suspension and the device not meeting cited Program standards." DVS found as facts that the conditional-certification letter "requires that the number of missing photos drops below 10 percent of data received by DVS in the daily data file," that Guardian was "suspended from performing new installs," and that it violated this condition. DVS also found that the original October 15, 2015 letter "decertified [Guardian] due to Guardian's direct violations of its July 17, 2015 suspension as well as not meeting the October 15, 2015 deadline to correct the missing photos issue."

The precise issues on appeal are whether either or both of DVS's two stated decertification grounds amount to arbitrary and capricious agency action. Those grounds are: (1) Guardian's daily data files were missing more than 10% of the required photos, and (2) Guardian installed two new IIDs after the July 17, 2015 suspension.

9

*A. The 10% standard as applied to the daily data files*

Guardian strenuously argues that DVS arbitrarily and capriciously limited the pool of data that it reviewed in making the decertification decision to the daily data files, rather than the entire universe of data available on Guardian's program-required website. Both parties agree that, although DVS's IID program requirements could be construed to require strict compliance with the photo requirements, DVS in practice tolerates some missing photos. DVS made an agency determination that missing photos must not exceed 10% of the photos in the daily data file. It applied that standard when it decertified Guardian.

By letter of June 3, 2015, DVS conditionally certified Guardian and mandated compliance with the 10% standard:

> DVS will continue to monitor Guardian's problem with downloading photos. Between March 23, 2015 and May 25, 2015, an average of *38 percent of the data Guardian sent in its daily data file was missing photos*. This is unacceptable. DVS expects that the percentage of data missing photos will drop significantly to below 10 percent by July 15, 2015.

(Emphasis added.) DVS's July 17, 2015 suspension letter to Guardian reiterated the 10% standard: "DVS expects that the percentage of *data missing photos* will drop to below 10 percent by October 15, 2015." (Emphasis added.) Guardian argues that the July 17 letter demonstrates that DVS's 10% standard applied to *all* data, and not to only the daily data files. Guardian argues that it was arbitrary and capricious for DVS, in its enforcement of the 10% standard, to apply that standard to only the daily data files.

10

The June, July, and October letters clearly indicate that DVS was consistently considering the percentage of missing photos in the daily data files. It identified the daily data file as the set of data to which the 10% measure would be applied in determining whether Guardian was exceeding the tolerance for missing photos. The original June 3, 2015 conditional-certification letter fairly notified Guardian of this. Reading the June 3, 2015 letter as a whole, it is clear that DVS expected Guardian to bring its 38% missing photo rate—which referred to the daily data files—to below 10% by July 15, 2015. We therefore consider whether DVS's selection of that subset of data was arbitrary and capricious.

To determine whether applying the 10% standard to the daily data files was arbitrary and capricious, we consider the purposes of the IID program's photo requirement. The statute that establishes the IID program criminalizes "tamper[ing] with, circumvent[ing], or bypass[ing]" an IID. Minn. Stat. § 171.306, subd. 6(b). As part of DVS's IID program certification standards, a photo of the person whose breath is being sampled is necessary to prevent a circumvention, i.e., "an unauthorized attempt to operate the vehicle or obstruct the camera." Minn. Dep't of Pub. Safety, *2015 Certification Process for the Minnesota Ignition Interlock Device Program* 2. In denying Guardian's administrative appeal, DVS concluded that "circumvention violations cannot be enforced without photographic evidence."

It is true that Guardian's position might also be reasonable, i.e., applying the 10% standard to the entire set of data and photos on Guardian's website. But the question before us is whether the subset of data selected by DVS was arbitrary and capricious, and

11

not whether another subset of data or a different measurement of missing-photo tolerance would have been permissible or even better. DVS reasonably limited application of the standard to photos of program participants reported in the daily data files, which by requirement of the IID program included all reported violations.

The legislature has specifically authorized DVS to establish and administer standards for the IID program. Minn. Stat. § 171.306. The availability of photographic evidence of who provided each failed IID sample is important to the effectiveness of the IID program. DVS's decertification and denial of Guardian's appeal were rationally connected to the underlying purposes of the photo requirement and the facts available in the administrative record. *See Review of 2005 Annual Automatic Adjustment of Charges*, 768 N.W.2d at 120. DVS's application of the 10% standard to the daily data files was not arbitrary and capricious.

The record supports (and Guardian does not significantly dispute) that Guardian's daily data files continued to include violations without accompanying photos in excess of the 10% standard. The record therefore supports the agency decision decertifying Guardian on this basis.

*B. Guardian's installation of two new devices during the suspension period*

Although the missing-photos issue is a sufficient basis for DVS to have decertified Guardian, we address Guardian's challenge to DVS's alternative basis for decertification: that Guardian installed two new devices during the suspension period. Guardian argues that this decertification ground is without substantial support in the administrative record and does not satisfy the cited program standards for decertification.

DVS advised Guardian by letter dated July 17, 2015 that Guardian was suspended "from performing new installs for 90 days." Guardian does not challenge the authority of DVS to impose this condition. When DVS decertified Guardian, it explained that it "discovered that Guardian installed two new devices during the suspension period," and that Guardian was therefore decertified based, in part, for "violation of the July 17, 2015 suspension letter."

Guardian admits that the first installation happened. It argues that, because that device was later removed, a single, remedied violation is not a sufficient basis for decertification. And Guardian specifically argues that the second of these installations was never completed. The service center began the installation, but it stopped short of completion and sent the customer elsewhere to get a non-Guardian IID installed in his vehicle.

We consider first the completed installation that Guardian concedes. DVS's July 17, 2015 suspension letter allowed Guardian to continue its conditional certification, albeit subject to an additional requirement: "Guardian [was] suspended from performing new installs for 90 days." By performing the installation on September 11, 2015, Guardian violated the terms of its conditional certification. Guardian argues that this isolated violation is insufficient to support decertification, because it was not a material violation, citing *Moskovitz v. City of St. Paul*, 218 Minn. 543, 551-552, 16 N.W.2d 745, 749-50 (1944). Guardian's reliance on *Moskovitz* is misplaced. In *Moskovitz*, the Minnesota Supreme Court noted that "minor infractions of [] regulations *unrelated to a licensee's business* would not constitute 'misconduct' authorizing the revocation of his

13

license." *Id.* at 551, 16 N.W.2d at 749 (emphasis added). Here, Guardian's violation was directly related to the subject of the conditional certification. Guardian installed an IID despite the July 17, 2015 letter suspending it from doing so. Guardian's installation of an IID during the suspension term violated a condition of their IID program certification, and therefore provided a separate, independent, and sufficient basis for DVS to decertify Guardian. DVS's decision to decertify Guardian based on its installation of a new IID was neither arbitrary nor capricious.

Because the record supports this basis for decertification based on violation of the conditional certification, we do not separately address the second and aborted installation.

In sum, the record supports two separate and permissible bases for decertification. DVS's selection of a 10% tolerance of missing photos in the daily data file was not arbitrary or capricious, and Guardian failed to comply with the missing-photo tolerance set by DVS and communicated to Guardian. As a separate basis for decertification, Guardian installed at least one IID after its continued certification had been expressly conditioned on Guardian installing no further devices. DVS's decertification was neither arbitrary nor capricious.

**Affirmed in part and vacated in part.**

14